(CONSTITUTIONAL LAW.)

## HOUSTON v. MOORE.

The act of the State of Pennsylvania, of the 28th of March, 1814, (providing, (sec. 21.) that the officers and privates of the militia of that State, neglecting or refusing to serve, when called into actual service, in pursuance of any order or requisition of the President of the United States, shall be liable to the penalties defined in the act of Congress of the 28th of February, 1795, c 277., or to any penalty which may have been prescribed since the date of that act, or which may hereafter be prescribed by any law of the United States, and also providing for the trial of such delinquents by a State Court Martial, and that a list of the delinquents fined by such Court should be furnished to the Marshal of the United States, &c. and also to the Comptroller of the Treasury of the United States, in order that the further proceedings directed to be had thereon by the laws of the United States might be completed,) is not repugnant to the constitution and laws of the United States.

THIS was a writ of error to the Supreme Court of the State of Pennsylvania, in a case where was drawn in question the validity of a statute of that

1820.

Houston
v.
Moore.

State, on the ground of its repugnancy to the constitution and laws of the United States, and the decision was in favour of its validity.   The statute which formed the ground of controversy in the State court, was passed on the 28th of March, 1814, and enacts, among other things, (sec. 21.) that every non-commissioned officer and private of the militia who shall have neglected or refused to serve when called into actual service, in pursuance of any order or requisition of the President of the United States, shall be liable to the penalties defined in the act of the Congress of the United States, passed on the 28th of February, 1795; and then proceeds to enumerate them, and to each clause adds—" or shall be liable to any penalty which may have been prescribed since the date of the passing of the said act, or which may hereafter be prescribed by any law of the United States."   The statute then further provides that, " within one month after the expiration of the time for which any detachment of militia shall have been called into the service of the United States, by or in pursuance of orders from the President of the United States, the proper brigade inspector shall summon a general or a regimental Court Martial, as the case may be, for the trial of such person or persons belonging to the detachment called out, who shall have refused or neglected to march therewith, or to furnish a sufficient substitute; or who, after having marched therewith, shall have returned, without leave from his commanding officer, of which delinquents the proper brigade inspector shall furnish to the said Court

Martial an accurate list. And as soon as the said Court Martial shall have decided in each of the cases which shall be submitted to their consideration, the President thereof shall furnish to the Marshal of the United States, or to his deputy, and also to the Comptroller of the Treasury of the United States, a list of the delinquents fined, in order that the further proceedings directed to be had thereon by the laws of the United States, may be completed."

Houston, the plaintiff in error, and in the original suit, was a private, enrolled in the Pennsylvania militia, and belonging to the detachment of the militia which was ordered out by the Governor of that State, in pursuance of a requisition from the President of the United States, dated the 4th of July, 1814. Being duly notified and called upon, he neglected to march with the detachment to the appointed place of rendezvous. He was tried for this delinquency before a Court Martial summoned under the authority of the executive of that State, in pursuance of the section of the statute above referred to. He appeared before the Court Martial, pleaded not guilty, and was in due form sentenced to pay a fine; for levying of which on his property, he brought an action of trespass in the State Court of Common Pleas, against the Deputy Marshal by whom it was levied. At the trial in that Court, the plaintiff prayed the Court to instruct the Jury, that the first, second, and third paragraphs of the 21st section of the above statute of Pennsylvania, so far as they related to the militia called into the

service of the United States, under the laws of Congress, and who failed to obey the orders of the President of the United States, are contrary to the constitution of the United States, and the laws of Congress made in pursuance thereof, and are, therefore, null and void. The Court instructed the jury that these paragraphs were not contrary to the constitution or laws of the United States, and were, therefore, not null and void. A verdict and judgment was thereupon rendered for the defendant, Moore; which judgment being carried by writ of error before the Supreme Court of Pennsylvania, the highest court of law or equity of that State, was affirmed; and the cause was then brought before this Court, under the 25th section of the Judiciary Act of 1789, c. 20.

This cause was argued at the last term, and continued to the present term for advisement.

Mr. *Hopkins*, for the plaintiff in error, argued, that the constitutional power of Congress over the militia, is *exclusive* of State authority, except as to officering and training them according to the discipline prescribed by Congress. By the constitution of the United States, (art. 1. s. 8.) Congress is invested with power "to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions." And also, "to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively

the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress." The terms " to provide for calling forth,"import an authority to place the militia under the power of the United States; in certain cases, implying a command, which the militia are bound to obey. Congress has exercised this authority by authorizing the President to call forth the militia in the cases mentioned in the constitution, and inflicting penalties on those who disobey the call.[a] Whenever a draft is made, the persons drafted are immediately, and to all intents and purposes, in the service of the United States, and from that moment all State authority over them ceases. The power to govern the militia, thus called forth, and employed in the service of the United States, is exclusively in the national government. A national militia grew out of the federal constitution, and did not previously exist. It is in its very nature one indivisible object, and of the utmost importance to the support of the federal authority and government.[b] But even supposing this power not to be exclusively vested in Congress, and admitting it to be *concurrent* between the United States' government, and the respective State governments; as Congress have legislated on the subject matter, to the extent of the authority given, State legislation, which is subordinate, is necessarily excluded. Even where the grant of a certain power to the government of the Union is not,

1820.

Houston
v.
Moore.

a Act of the 28th of February, 1795, c. 277. (CI.)
b Livingston v. Van Ingen, 9 *Johns. Rep.* 507. 565. 575,

in express terms, exclusive, yet if the exercise of it by that government be practically inconsistent with the exercise of the same power by the States, their laws must yield to the supremacy of the laws of the United States.[a] *Meade's* case is an example of the application of the same principle to the very question now before the Court.[b]  Is it possible that Congress meant to give power to a State Court, without naming the Court, or granting the power in express terms?  The exercise of this jurisdiction by a State Court Martial would either oust the United States' Courts of their jurisdiction, or might subject the alleged delinquents to be twice tried and punished for the same offence.  If the State Court could try them, the Governor of the State could pardon them for an offence committed against the laws of the United States.  There is, in various particulars, a manifest repugnancy between the two laws.  They are in direct collision; and, consequently, the State law is void.  Again; if the State of Pennsylvania had power to pass the act of the 28th of March, 1814, or the 21st section of that act, it was superseded by the act of Congress of the 18th of April, 1814, c. 670., occupying the same ground, and making a more complete provision on the same subject.  These two laws are still more manifestly repugnant and inconsistent with each other.  Again; if the State law was constitutional, and not superseded by the act of Congress of the 18th of April, 1814, c. 670. still the treaty of peace

*a* Livingston v. Van Ingen, 9 *Johns. Rep.* 507. 565. 575.
*b* 5 *Hall's Law Journ.* 536.

between the United States and Great Britain, ratified in February, 1815, suspended and abrogated all proceedings under the State law.

Mr. *C. J. Ingersoll* and Mr. *Rogers*, contra, insisted, that there were many cases in which the laws of the United States are carried into effect by State Courts and State officers; that this was contemplated by the framers of the constitution; that the Governor of Pennsylvania, by whom the Court Martial, in the present case, was summoned, is the commander in chief of the militia of that State, except when called into the actual service of the United States. The militia drafted in pursuance of the requisition of the President were not in actual service, until mustered, and in the pay of the United States; until they reached the place of rendezvous, and were put under the command of the United States' officers. It is not the requisition, but the obedience to the requisition, which makes the persons drafted amenable to martial law, as a part of the military force of the Union. When the constitution speaks of the power of "calling forth" the militia, it means an effectual calling. The plaintiff was *called,* but not *called forth.* The power invested in Congress, is to determine in what mode the requisition shall be made; how the quota of each State is to be apportioned; from what States requisitions shall be made in particular cases; and by what process the call is to be enforced. Congress not having directed the mode by which Courts Martial are to be summoned and held for the purpose of enforcing it, the States have a constitutional

1820.

Houston
v.
Moore.

authority to supply the omission. Before this Court proceeds to declare the State law made for this purpose to be void, it must be satisfied, beyond all doubt, of its repugnancy to the constitution.[a] The case must fall within some of the express prohibitory clauses of the constitution, or some of its clearly implied prohibitions. It must not be the exercise of a political discretion with which the legislature is invested, for that can never become the subject of judicial cognizance. It is insisted, that the power of Congress over the militia is a concurrent, and not an exclusive power. All powers, which previously existed in the States, and which are not expressly delegated to the United States, are reserved.[b] The power of making laws on the subject of the militia is not prohibited to the States, and has always been exercised by them. The necessity of a concurrent jurisdiction in certain cases results from the peculiar division of the powers of sovereignty in our government; and the principle, that all authorities of which the States are not expressly devested in favour of the Union, or the exercise of which, by the States, would be repugnant to those granted to the Union, are reserved to the States, is not only a theoretical consequence of that division, but is clearly admitted by the whole tenor of the constitution. The cotemporaneous construction of the constitu-

a Calder et ux. v. Bull et ux. 3 Dall. 399. Emerick v. Harris, 1 Binney, 416. 423. 6 Cranch, 87. Cooper v. Telfair, 4 Dall. 14. 18.

b Livingston et al. v. Van Ingen, 9 Johns. Rep. 501. 565. 573. et seq. 1 Tuck. Bl. Com. Appx. 308.

tion, by those who supported its adoption, supposes the power in question to be concurrent, and not exclusive.[a] The power of the States over the militia is not taken away ; it existed in them before the establishment of the constitution, and there being no negative clause prohibiting its exercise by them, it still resides in the States, so far as an exercise of it by them is not absolutely repugnant to the authority of the Union. Before the militia are actually employed in the service of the United States, Congress has only a power concurrent with that of the States, to provide for organizing, arming, and disciplining them. The authority of appointing the officers and training the militia, is expressly reserved to the States, because, in these respects, it was intended that they should have an *exclusive* power. So, also, Congress has the exclusive power of governing such part of the militia as may be actually employed in the service of the United States ; but not until it is thus actually employed. The power of governing the militia, is the power of subjecting it to the rules and articles of war. But it is a principle manifestly implied in the constitution, that the militia cannot be subjected to martial law, except when in actual service, in time of war, rebellion, or invasion.[b] It necessarily results from the circumstance of the power of making provision for organizing, arming, and disciplining the militia being concurrent, that if

a *Letters of Publius. or the Federalist*, Nos. 27. 32. *Debates in the Virginia Convention*, 272. 284. 286. 298.

b 1 *Tucker's Bl. Com.* 213. Duffield v. Smith, 6 *Binney*, 306.

Congress has not legislated upon any part of the subject, the States have a right to supply the omission. This right has been exercised, in the present case, in aid of, and not in hostility to, the federal authority. The fines which are collected under the law, are not appropriated to the use of the State, but are to be paid into the treasury of the Union. The power of making uniform laws of naturalization is different from that now under consideration. The power of naturalization is an authority granted to the Union, to which a similar authority in the States would be absolutely and totally repugnant. A naturalized citizen of one State would be entitled to all the privileges of a citizen in every other State, and the greatest confusion would be produced by a variety of rules on the subject. But even naturalization has been sometimes held to be a power residing concurrently in the Union and the States, and to be exercised by the latter in such a way as not to contravene the rule established by the Union.[a] But in the present case, the State law is not inconsistent with the act of Congress. It comes in aid of it. It supplies its defects, and remedies its imperfections. It co-operates with it for the promotion of the same end. The offence which is made punishable by the State law, is an offence against the State, as well as the Union. It being the duty of the State to furnish its quota, it has a right to compel the drafted militia to appear and march. *Calling the militia forth,* and *governing them* after they are in actual ser-

[a] Collet v. Collet, 2 *Dall.* 294, 296.

1820.

Houston
v.
Moore.

vice, are two distinct things.   A State law, acting upon the militia *before* they have entered into the actual service of the Union, is so far from interfering with the power of Congress to legislate on the same subject, that it may have, and, we contend, that it does have, in the present case, a powerful effect in aid of the national authority.   But it would be almost impossible for the State to enact a law concerning the militia, *after* they are in the actual service of the United States, which would not be irreconcilable with the authority of the latter.   Even supposing that Congress should pass a law inflicting one penalty for disobedience to the call, and the State inflict another, they would still both co-operate to the same end.   In practice, the delinquent could not be punished twice for the same offence ; but there would be no theoretical repugnancy between the two laws. Congress, in the statutes enacted by them, have not intended to compel citizens enrolled in the militia to enter into the actual service of the United States. It is not a conscription ; but a draft, with the option to the individual to be excused from a specific performance of the duty by the payment of a pecuniary composition.   The acts of Congress are defective in not providing how, or by whom, Courts Martial shall be held, for the trial of delinquents, and the collection of these pecuniary penalties.   The State legislature, acting with a sincere desire to promote the objects of the national government, supplied these defects, by adding such details as were indispensably necessary to execute the acts of Congress.

1820.
Houston
v.
Moore.
Feb. 16th.
1820.

There is, then, a perfect harmony between the two laws.

The judgment of the Court was delivered at the present term, by Mr. Justice WASHINGTON, who, after stating the facts of the case, proceeded as follows:

There is but one question in this cause, and it is, whether the act of the legislature of Pennsylvania, under the authority of which the plaintiff in error was tried, and sentenced to pay a fine, is repugnant to the Constitution of the United States, or not?

But before this question can be clearly understood, it will be necessary to inquire, 1. What are the powers granted to the general government, by the Constitution of the United States, over the militia? and, 2. To what extent they have been assumed and exercised?

1. The constitution declares, that Congress shall have power to provide for calling forth the militia in three specified cases: for organizing, arming, and disciplining them; and for governing such part of them as may be employed in the service of the United States; reserving to the States, respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress. It is further provided, that the President of the United States shall be commander of the militia, when called into the actual service of the United States.

2. After the constitution went into operation, Congress proceeded by many successive acts to ex-

ercise these powers, and to provide for all the cases contemplated by the constitution.

The act of the 2d of May, 1792, which is re-enacted almost verbatim by that of the 28th of February, 1795, authorizes the President of the United States, in case of invasion, or of imminent danger of it, or when it may be necessary for executing the laws of the United States, or to suppress insurrections, to call forth such number of the militia of the States most convenient to the scene of action, as he may judge necessary, and to issue his orders for that purpose, to such officer of the militia as he shall think proper. It prescribes the amount of pay and allowances of the militia so called forth, and employed in the service of the United States, and subjects them to the rules and articles of war applicable to the regular troops. It then proceeds to prescribe the punishment to be inflicted upon delinquents, and the tribunal which is to try them, by declaring, that every officer or private who should fail to obey the orders of the President, in any of the cases before recited, should be liable to pay a certain fine, to be determined and adjudged by a Court Martial, and to be imprisoned, by a like sentence, on failure of payment. The Courts Martial for the trial of militia, are to be composed of militia officers only, and the fines to be certified by the presiding officer of the court, to the marshal of the district, and to be levied by him, and, also, to the supervisor, to whom the fines are to be paid over.

The act of the 18th of April, 1814, provides, that Courts Martial, to be composed of militia officers

only, for the trial of militia, *drafted, detached and called forth for* the service of the United States, whether acting in conjunction with the regular forces or otherwise, shall, whenever necessary, be appointed, held, and conducted in the manner prescribed by the rules and articles of war, for appointing, holding, and conducting Courts Martial for the trial of delinquents in the army of the United States. Where the punishment prescribed, is by stoppage of pay, *or imposing a fine* limited by the amount of pay, the same is to have relation to the monthly pay existing *at the time the offence was committed.* The residue of the act is employed in prescribing the manner of conducting the trial; the rules of evidence for the government of the Court; the time of service, and other matters not so material to the present inquiry. The only remaining act of Congress which it will be necessary to notice in this general summary of the laws, is that of the 8th of May, 1792, for establishing an uniform militia in the United States. It declares who shall be subject to be enrolled in the militia, and who shall be exempt; what arms and accoutrements the officers and privates shall provide themselves with; arranges them into divisions. brigades, regiments, battalions, and companies, in such manner as the State legislatures may direct; declares the rules of discipline by which the militia is to be governed, and makes provision for such as should be disabled whilst in the actual service of the United States. The pay and subsistence of the militia, whilst in service, are provided

for by other acts of Congress, and particularly by one passed on the third of January, 1795.

1820.

Houston
v.
Moore.

The laws which I have referred to, amount to a full execution of the powers conferred upon Congress by the constitution. They provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasion. They also provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States; leaving to the States respectively, the appointment of the officers, and the authority of training them according to the discipline prescribed by Congress.

This system may not be formed with as much wisdom as, in the opinion of some, it might have been, or as time and experience may hereafter suggest. But to my apprehension, the whole ground of Congressional legislation is covered by the laws referred to. The manner in which the militia is to be organized, armed, disciplined, and governed, is fully prescribed; provisions are made for drafting, detaching, and calling forth the State quotas, when required by the President. The President's orders may be given to the chief executive magistrate of the State, or to any militia officer he may think proper; neglect, or refusal to obey orders, is declared to be an offence against the laws of the United States, and subjects the offender to trial, sentence and punishment, to be adjudged by a Court Martial, to be summoned in the way pointed out by the articles and rules of war; and the mode of proceeding to

be observed by these courts, is detailed with all ne-cessary perspicuity.

If I am not mistaken in this view of the subject, the way is now open for the examination of the great question in the cause. Is it competent to a Court Martial, deriving its jurisdiction under State authority, to try, and to punish militia men, drafted, detached, and called forth by the President into the service of the United States, who have refused, or neglected to obey the call?

In support of the judgment of the Court below, I understand the leading arguments to be the two following: 1. That militia men, when called into the service of the United States by the President's orders, communicated either to the executive magistrate, or to any inferior militia officer of a State, are not to be considered as being in the service of the United States until they are mustered at the place of rendezvous. If this be so, then, 2dly. The State retains a right, concurrent with the government of the United States, to punish his delinquency. It is admitted on the one side, that so long as the militia are acting under the military jurisdiction of the State to which they belong, the powers of legislation over them are concurrent in the general and State government. Congress has power to provide for organizing, arming, and disciplining them; and this power being unlimited, except in the two particulars of officering and training them, according to the discipline to be prescribed by Congress, it may be exercised to any extent that may be deemed necessary by Congress. But as State militia, the power of

the State governments to legislate on the same sub-
jects, having existed prior to the formation of the
constitution, and not having been prohibited by that
instrument, it remains with the States, subordinate
nevertheless to the paramount law of the general
government, operating upon the same subject. On
the other side, it is conceded, that after a detachment
of the militia have been called forth, and have en-
tered into the service of the United States, the au-
thority of the general government over such detach-
ment is exclusive. This is also obvious. Over the
national militia, the State governments never had,
or could have, jurisdiction. None such is conferred
by the constitution of the United States; conse-
quently, none such can exist.

The first question then is, at what time, and under
what circumstances, does a portion of militia, draft-
ed, detached, and called forth by the President, en-
ter into the service of the United States, and change
their character from State to National militia?
That Congress might by law have fixed the period,
by confining it to the draft; the order given to the
Chief Magistrate, or other militia officer of the State;
to the arrival of the men at the place of rendezvous;
or to any other circumstance, I can entertain no
doubt. This would certainly be included in the
more extensive powers of calling forth the militia,
organizing, arming, disciplining, and governing
them. But has Congress made any declaration on
this subject, and in what manner is the will of that
body, as expressed in the before mentioned laws, to
be construed? It must be conceded, that there is

no law of the United States which declares in express terms, that the organizing, arming, and equipping a detachment, on the order of the President to the State militia officers, or to the militia men personally, places them in the service of the United States. It is true, that the refusal or neglect of the militia to obey the orders of the President, is declared to be an offence against the United States, and subjects the offender to a certain prescribed punishment. But this flows from the power bestowed upon the general government to call them forth ; and, consequently, to punish disobedience to a legal order; and by no means proves, that the call of the President places the detachment in the service of the United States. But although Congress has been less explicit on this subject than they might have been, and it could be wished they had been, I am, nevertheless, of opinion, that a fair construction of the different militia laws of the United States, will lead to a conclusion, that something more than organizing and equipping a detachment, and ordering it into service, was considered as necessary to place the militia in the service of the United States. That preparing a detachment for such service, does not place it in the service, is clearly to be collected from the various temporary laws which have been passed, authorizing the President to require of the State executives to organize, arm, and equip their State quotas of militia for the service of the United States. Because they all provide that the requisition shall be to hold such quotas in readiness to march at a moment's warning ; and some, if not all of them, au-

thorize the President to call *into actual service* any part, or the whole of said quotas, or detachments; clearly distinguishing between the orders of the President to *organize, and hold the detachments in readiness for service,* and their entering *into service.*

The act of the 28th of February, 1795, declares, that the militia *employed in the service* of the United States, shall receive the same pay and allowance as the troops of the United States, and shall be subject to the same rules and articles of war. The provisions made for disabled militia men, and for their families, in case of their death, are, by other laws, confined to such militia as are, or have been, in actual service. There are other laws which seem very strongly to indicate the *time* at which they are considered as being in service. Thus, the act of the 28th of February, 1795, declares, that a militia man called into the service of the United States, shall not be compelled to serve more than three months *after his arrival at the place of rendezvous,* in any one year. The 8th section of the act of the 18th of April, 1814, declares, that the militia, *when called into the service of the United States,* if, in the President's opinion, the public interest requires it, may be compelled to serve for a term not exceeding six months, *after their arrival at the place of rendezvous,* in any one year; and by the 10th section, provision is made for the expenses which may be incurred by marching the militia *to their places of rendezvous,* in pursuance of a requisition of the President, and they are to be adjusted and paid in like manner as those incurred after their arrival at the rendezvous.

The 3d section of the act of the 2d of January, 1795, provides, that whenever the militia shall be called into the actual service of the United States, their pay shall be deemed to commence *from the day of their appearing at the place of battalion, regimental, or brigade rendezvous,* allowing a day's pay and ration for every 15 miles from their homes to said rendezvous.

From this brief summary of the laws, it would seem, that *actual service* was considered by Congress as the criterion of national militia ; and that the service did not commence until the arrival of the militia at the place of rendezvous. That is the *terminus a quo,* the service, the pay, and subjection to the articles of war, are to commence and continue. If the service, in particular, is to continue for a certain length of time, from a certain day, it would seem to follow, almost conclusively, that the service commenced on that, and not on some prior day. And, indeed, it would seem to border somewhat upon an absurdity, to say, that a militia man was in the service of the United States at any time, who, so far from entering into it for a single moment, had refused to do so, and who never did any act to connect him with such service. It has already been admitted, that if Congress had pleased so to declare, a militia man, called into the service of the United States, might have been held and considered as being constructively in that service, though not actually so ; and might have been treated in like manner as if he had appeared at the place of rendezvous. But Congress has not so declared, nor have they made

any provision applicable to such a case ; on the contrary, it would appear, that a fine to be paid by the delinquent militia man, was deemed an equivalent for his services, and an atonement for his disobedience.

If, then, a militia man, called into the service of the United States, shall refuse to obey the order, and is, consequently, not to be considered as in the service of the United States, or removed from the military jurisdiction of the state to which he belongs, the next question is, is it competent to the State to provide for trying and punishing him for his disobedience, by a Court Martial, deriving its authority under the State ? It may be admitted at once, that the militia belong to the States, respectively, in which they are enrolled, and that they are subject, both in their civil and military capacities, to the jurisdiction and laws of such State, except so far as those laws are controlled by acts of Congress constitutionally made. Congress has power to provide for organizing, arming, and disciplining the militia ; and it is presumable, that the framers of the constitution contemplated a full exercise of all these powers. Nevertheless, if Congress had declined to exercise them, it was competent to the State governments to provide for organizing, arming, and disciplining their respective militia, in such manner as they might think proper. But Congress has provided for all these subjects, in the way which that body must have supposed the best calculated to promote the general welfare, and to provide for the national defence. After this, can the State govern-

ments enter upon the same ground—provide for the same objects as they may think proper, and punish in their own way violations of the laws they have so enacted? The affirmative of this question is asserted by the defendant's counsel, who, it is understood, contend, that unless such State laws are in direct contradiction to those of the United States, they are not repugnant to the Constitution of the United States.

From this doctrine, I must, for one, be permitted to dissent. The two laws may not be in such absolute opposition to each other, as to render the one incapable of execution, without violating the injunctions of the other; and yet, the will of the one legislature may be in direct collision with that of the other. This will is to be discovered as well by what the legislature has not declared, as by what they have expressed. Congress, for example, has declared, that the punishment for disobedience of the act of Congress, shall be a certain fine; if that provided by the State legislature for the same offence be a similar fine, with the addition of imprisonment or death, the latter law would not prevent the former from being carried into execution, and may be said, therefore, not to be repugnant to it. But surely the will of Congress is, nevertheless, thwarted and opposed.

This question does not so much involve a contest for power between the two governments, as the rights and privileges of the citizen, secured to him by the Constitution of the United States, the benefit of which he may lawfully claim.

If, in a specified case, the people have thought proper to bestow certain powers on Congress as the safest depositary of them, and Congress has legislated within the scope of them, the people have reason to complain that the same powers should be exercised at the same time by the State legislatures. To subject them to the operation of two laws upon the same subject, dictated by distinct wills, particularly in a case inflicting pains and penalties, is, to my apprehension, something very much like oppression, if not worse. In short, I am altogether incapable of comprehending how two distinct wills can, at the same time, be exercised in relation to the same subject, to be effectual, and at the same time compatible with each other. If they correspond in every respect, then the latter is idle and inoperative; if they differ, they must, in the nature of things, oppose each other, so far as they do differ. If the one imposes a certain punishment for a certain offence, the presumption is, that this was deemed sufficient, and, under all circumstances, the only proper one. If the other legislature impose a different punishment, in kind or degree, I am at a loss to conceive how they can both consist harmoniously together.

I admit that a legislative body may, by different laws, impose upon the same person, for the same offence, different and cumulative punishments; but then it is the will of the same body to do so, and the second, equally with the first law, is the will of that body. There is, therefore, and can be, no opposition of wills. But the case is altogether different, where

1820.

Houston
v.
Moore.

the laws flow from the wills of distinct, co-ordinate bodies.

This course of reasoning is intended as an answer to what I consider a novel and unconstitutional doctrine, that in cases where the State governments have a concurrent power of legislation with the national government, they may legislate upon any subject on which Congress has acted, provided the two laws are not in terms, or in their operation, contradictory and repugnant to each other.

Upon the subject of the militia, Congress has exercised the powers conferred on that body by the constitution, as fully as was thought right, and has thus excluded the power of legislation by the States on these subjects, except so far as it has been permitted by Congress; although it should be conceded, that important provisions have been omitted, or that others which have been made might have been more extended, or more wisely devised.

There still remains another question to be considered, which more immediately involves the merits of this cause. Admit that the legislature of Pennsylvania could not constitutionally legislate in respect to delinquent militia men, and to prescribe the punishment to which they should be subject, had the State Court Martial jurisdiction over the subject, so as to enforce the laws of Congress against these delinquents?

This, it will be seen, is a different question from that which has been just examined. That respects the power of a State legislature to legislate upon a subject, on which Congress has declared its will. This concerns the jurisdiction of a State military tri-

bunal to adjudicate in a case which depends on: a law of Congress, and to enforce it.

It has been already shown that. Congress has prescribed the punishment to be inflicted on a militia man detached and called forth, but who has refused to march ; and has also provided that Courts Martial for the trial of such delinquents, to be composed of militia officers only, shall be held and conducted in the manner pointed out by the rules and articles of war.

That Congress might have vested the exclusive jurisdiction in Courts Martial to be held and conducted as the laws of the United States have prescribed, will, I presume, hardly be questioned. The offence to be punished grows out of the constitution and laws of the United States, and is, therefore, clearly a case which might have been withdrawn from the concurrent jurisdiction of the State tribunals. But an exclusive jurisdiction is not given to Courts Martial, deriving their authority under the national government, by express words :—the question then (and I admit the difficulty of it) occurs, is this a case in which the State Courts Martial could exercise jurisdiction ?

Speaking upon the subject of the federal judiciary, the *Federalist* distinctly asserts the doctrine, that the United States, in the course of legislation upon the objects entrusted to their direction, may. commit the decision of causes arising upon a particular regulation to the federal Courts solely, if it should be deemed expedient ; yet that in every case, in which the State tribunals should not be expressly ex-

1820.

Houston
v.
Moore.

cluded by the acts of the national legislature, they would, of course, take cognizance of the causes to which those acts might give birth.[a]

I can discover, I confess, nothing unreasonable in this doctrine; nor can I perceive any inconvenience which can grow out of it, so long as the power of Congress to withdraw the whole, or any part of those cases, from the jurisdiction of the State Courts, is, as I think it must be, admitted.

The practice of the general government seems strongly to confirm this doctrine; for at the first session of Congress, which commenced after the adoption of the constitution, the judicial system was formed; and the exclusive and concurrent jurisdiction conferred upon the Courts created by that law, were clearly distinguished and marked; showing that, in the opinion of that body, it was not sufficient to vest an exclusive jurisdiction, where it was deemed proper, merely by a grant of jurisdiction generally. In particular, this law grants exclusive jurisdiction to the Circuit Courts of all crimes and offences cognizable under the authority of the United States, except where the laws of the United States should otherwise provide; and this will account for the proviso in the act of the 24th of February, 1807, ch. 75., concerning the forgery of the notes of the Bank of the United States, "that nothing in that act contained should be construed to deprive the courts of the individual States of jurisdiction under the laws of the several States over offences made punishable by that act." A similar proviso is to be found in the act of the 21st of April,

a *Letters of Publius, or the Federalist.* No. 82.

1806, ch. 49., concerning the counterfeiters of the current coin of the United States. It is clear that, in the opinion of Congress, this saving was necessary in order to authorize the exercise of concurrent jurisdiction by the State Courts over those offences ; and there can be very little doubt but that this opinion was well founded. The judiciary act had vested in the federal courts exclusive jurisdiction of all offences cognizable under the authority of the United States, unless where the laws of the United States should otherwise direct. The States could not, therefore, exercise a concurrent jurisdiction in those cases, without coming into direct collision with the laws of Congress. But by these savings Congress did provide, that the jurisdiction of the federal Courts in the specified cases should not be exclusive ; and the concurrent jurisdiction of the State Courts was instantly restored, so far as, under State authority, it could be exercised by them.

There are many other acts of Congress which permit jurisdiction over the offences therein described, to be exercised by State magistrates and Courts ; not, I presume, because such permission was considered to be necessary under the constitution, in order to vest a concurrent jurisdiction in those tribunals ; but because, without it, the jurisdiction was exclusively vested in the national Courts by the judiciary act, and consequently could not be otherwise exercised by the State Courts. For I hold it to be perfectly clear, that Congress cannot confer jurisdiction upon any Courts, but such as exist under the constitution and laws of the United States, although the State Courts

*1820.*

Houston
v.
Moore.

may exercise jurisdiction on cases authorized by the laws of the State, and not prohibited by the exclusive jurisdiction of the federal Courts.

What, then, is the real object of the law of Pennsylvania which we are considering? I answer, to confer authority upon a State Court Martial to enforce the laws of the United States against delinquent militia men, who had disobeyed the call of the President to enter into the service of the United States; for, except the provisions for vesting this jurisdiction in such a Court, this act is, in substance, a re-enactment of the acts of Congress, as to the description of the offence, the nature and extent of the punishment, and the collection and appropriation of the fines imposed.

Why might not this Court Martial exercise the authority thus vested in it by this law? As to crimes and offences against the United States, the law of Congress had vested the cognizance of them exclusively in the federal Courts. The State Courts, therefore, could exercise no jurisdiction whatever over such offences, unless where, in particular cases, other laws of the United States had otherwise provided; and wherever such provision was made, the claim of exclusive jurisdiction to the particular cases was withdrawn by the United States, and the concurrent jurisdiction of the State Courts was *eo instanti* restored, not by way of grant from the national government, but by the removal of a disability before imposed upon the State tribunals.

But military offences are not included in the act of Congress, conferring jurisdiction upon the Circuit

and District Courts ; no person has ever contended that such offences are cognizable before the common law Courts. The militia laws have, therefore, provided, that the offence of disobedience to the President's call upon the militia, shall be cognizable by a Court Martial of the United States; but an exclusive cognizance is not conferred upon that Court, as it had been upon the common law Courts as to other offences, by the judiciary act. It follows, then, as I conceive, that jurisdiction over this offence remains to be concurrently exercised by the national and State Courts Martial, since it is authorized by the laws of the State, and not prohibited by those of the United States. Where is the repugnance of the one law to the other? The jurisdiction was clearly concurrent over militia men, not engaged in the service of the United States; and the acts of Congress have not disturbed this state of things, by asserting an exclusive jurisdiction. They certainly have not done so in terms; and I do not think that it can be made out by any fair construction of them. The act of 1795 merely declares, that this offence shall be tried by *a Court Martial.* This was clearly not exclusive; but, on the contrary, it would seem to import, that such Court might be held, under national, or State authority.

The act of 1814 does not render the jurisdiction necessarily exclusive. It provides, that Courts Martial for the trial of militia, drafted and called forth, shall, *when necessary,* be appointed, held, and conducted, in the manner prescribed by the rules of war.

If the mere assignment of jurisdiction to a particu-

lar Court, does not necessarily render it exclusive, as I have already endeavoured to prove, then it would follow, that this law can have no such effect; unless, indeed, there is a difference in this respect between the same language, when applied to military, and to civil Courts; and if there be a difference, I have not been able to perceive it. But the law uses the expression " when necessary?" How is this to be understood? It may mean, I acknowledge, whenever there are delinquents to try; but, surely, if it import no more than this, it was very unnecessarily used, since it would have been sufficient to say, that Courts Martial for the trial of militia called into service, should be formed and conducted in the manner prescribed by the law. The act of 1795, had declared who were liable to be tried, but had not said with precision before what Court the trial should be had. This act describes the Court; and the two laws being construed together, would seem to mean that every such delinquent as is described in the act of 1795, should pay a certain fine, to be determined and adjudged by a Court Martial, to be composed of militia officers, to be appointed and conducted in the manner prescribed by the articles of war. These words, *when necessary*, have no definite meaning, if they are confined to the existence of cases for trial before the Court. But if they be construed (as I think they ought to be) to apply to trials rendered necessary by the omission of the States to provide for State Courts Martial to exercise a jurisdiction in the case, or of such Courts to take cognizance of them, when so authorized, they have an important, and a useful

meaning. If the State Court Martial proceeds to take cognizance of the cases, it may not appear necessary to the proper officer in the service of the United States, to summon a Court to try the same cases ; if they do not, or for want of authority cannot try them, then it may be deemed necessary to convene a Court Martial under the articles of war, to take, and to exercise the jurisdiction.

There are two objections which were made by the plaintiff's counsel, to the exercise of jurisdiction in this case, by the State Court Martial, which remain to be noticed.

1. It was contended, that if the exercise of this jurisdiction be admitted, that the sentence of the Court would either oust the jurisdiction of the United States' Court Martial, or might subject the accused to be twice tried for the same offence. To this I answer, that, if the jurisdiction of the two Courts be concurrent, the sentence of either Court, either of conviction or acquittal, might be pleaded in bar of the prosecution before the other, as much so as the judgment of a State Court, in a civil case of concurrent jurisdiction, may be pleaded in bar of an action for the same cause, instituted in a Circuit Court of the United States.

Another objection is, that if the State Court Martial had authority to try these men, the Governor of that State, in case of conviction, might have pardoned them. I am by no means satisfied that he could have done so ; but if he could, this would only furnish a reason why Congress should vest the jurisdiction in these cases, exclusively in a Court Martial acting under the authority of the United States.

Upon the whole, I am of opinion, after the most laborious examination of this delicate question, that the State Court Martial had a concurrent jurisdiction with the tribunal pointed out by the acts of Congress to try a militia man who had disobeyed the call of the President, and to enforce the laws of Congress against such delinquent; and that this authority will remain to be so exercised until it shall please Congress to vest it exclusively elsewhere, or until the State of Pennsylvania shall withdraw from their Court Martial the authority to take such jurisdiction. At all events, this is not one of those clear cases of repugnance to the Constitution of the United States, where I should feel myself at liberty to declare the law to be unconstitutional; the sentence of the Court *coram non judice*; and the judgment of the Supreme Court of Pennsylvania erroneous on these grounds.

Two of the judges are of opinion, that the law in question is unconstitutional, and that the judgment below ought to be reversed.

The other judges are of opinion, that the judgment ought to be affirmed; but they do not concur in all respects in the reasons which influence my opinion.

Mr. Justice JOHNSON. It is not very easy to form a distinct idea of what the question in this case really is. An individual having offended against a law of his own State, has been cited before a Court constituted under the laws of that State, and there convicted and fined. His complaint is, that his offene was an

offence against the laws of the United States, that he

is liable to be punished under those laws, and cannot, therefore, be constitutionally punished under the laws of his own State.

If any right secured to him under the State constitution has been violated, it is not our affair. His complaint before this Court must be either that some law, or some constitutional provision of the United States, has been violated in this instance; or he must seek elsewhere for redress. This Court can relieve him only upon the supposition that the State law under which he has been fined is inconsistent with some right secured to him, or secured to the United States, under the constitution. Now, the United States complain of nothing; the act of Pennsylvania was a candid, spontaneous, ancillary effort in the service of the United States; and all the plaintiff in error has to complain of is, that he has been punished by a State law, when he ought to have been punished under a law of the United States, which he contends he has violated.

I really have not been able to satisfy myself that it is any case at all for the cognizance of this Court; but from respect for the opinion of others, I will proceed to make some remarks on the questions which have been raised in the argument.

Why may not the same offence be made punishable both under the laws of the States, and of the United States? Every citizen of a State owes a double allegiance; he enjoys the protection and participates in the government of both the State and the United States. It is obvious, that in those cases in

1820.

Houston
v.
Moore.

which the United States may exercise the right of exclusive legislation, it will rest with Congress to determine whether the general government shall exercise the right of punishing exclusively, or leave the States at liberty to exercise their own discretion. But where the United States cannot assume, or where they have not assumed, this exclusive exercise of power, I cannot imagine a reason why the States may not also, if they feel themselves injured by the same offence, assert their right of inflicting punishment also. In cases affecting life or member, there is an express restraint upon the exercise of the punishing power. But it is a restriction which operates equally upon both governments; and according to a very familiar principle of construction, this exception would seem to establish the existence of the general right. The actual exercise of this concurrent right of punishing is familiar to every day's practice. The laws of the United States have made many offences punishable in their Courts, which were and still continue punishable under the laws of the States. Witness the case of counterfeiting the current coin of the United States, under the act of April 21st, 1806, in which the State right of punishing is expressly recognized and preserved. Witness also the crime of robbing the mail on the highway, which is unquestionably cognizable as highway-robbery under the State laws, although made punishable under those of the United States.

With regard to militia men ordered into service, there exists a peculiar propriety in leaving them subject to the coercive regulations of both governments.

The safety of each is so worked up with that of all the States, and the honour and peculiar safety of a particular State may so often be dependant upon the alacrity with which her citizens repair to the field, that the most serious mortifications and evils might result from refusing the right of lending the strength of the State authority to quicken their obedience to the calls of the United States.

But, it is contended, if the States can at all legislate or adjudicate on the subject, they may affect to aid, when their real object is nothing less than to embarrass, the progress of the general government.

I acknowledge myself at a loss to imagine how this could ever be successfully attempted. Opposition, whether disguised or real, is the same thing. It is true, if we could admit that an acquittal in the State Courts could be pleaded in bar to a prosecution in the Courts of the United States, the evil might occur. But this is a doctrine which can only be maintained on the ground that an offence against the laws of the one government, is an offence against the other government; and can surely never be successfully asserted in any instances but those in which jurisdiction is vested in the State Courts by statutory provisions of the United States. In contracts, the law is otherwise. The decision of any Court of competent jurisdiction is final, whatever be the government that gives existence to the Court. But crimes against a government are only cognizable in its own Courts, or in those which derive their right of holding jurisdiction from the offended government.

Yet, were it otherwise, I cannot perceive with what correctness we can, from the possible abuse of a power, reason away the actual possession of it in the States. Such considerations were only proper for the ears of those who established the actual distribution of powers between the States and the United States. The absurdities that might grow out of an affected co-operation in the States, with a real view to produce embarrassment, furnish the best guaranty against the probability of its ever being attempted, and the surest means of detecting and defeating it. We may declare defects in the constitution, without being justly chargeable with creating them; but if they exist, it is not for us to correct them. In the present instance, I believe the danger imaginary, and if it is not, it must pass *ad aliud examen*.

But whatever be the views entertained on this question, I am perfectly satisfied that the individual in this case was not amenable to any law of the United States. Both that there was no law of the United States that reached his case, and that there was nothing done, or intended to be done by the government of the United States, to bring him within their laws, before he reached the place of rendezvous.

It is obvious that there are two ways by which the militia may be called into service; the one is under State authority, the other under authority of the United States. The power of Congress over the militia is limited but by two reservations in favour of the States, viz. the right of officering and that of training them. When distributed by the States under their own officers the general government have

the right, if they choose to exercise it, of designating both the officer and private who shall serve, and to call him forth or punish him for not coming. But the possession of this power, or even the passing of laws in the exercise of it, does not preclude the general government from leaning upon the State authority, if they think proper, for the purpose of calling the militia into service. They may command or request; and in the case before us, they obviously confined themselves to the latter mode. Indeed, extensive as their power over the militia is, the United States are obviously intended to be made in some measure dependant upon the States for the aid of this species of force. For, if the States will not officer or train their men, there is no power given to Congress to supply the deficiency.

The method of calling forth the militia by requisition, is, it is believed, the only one hitherto resorted to in any instance. Being partially dependant upon the integrity of the States, the general government has hitherto been satisfied to rest wholly on that integrity, and, except in very few instances, has never been disappointed. The compulsory power has been in its practice held in reserve, as only intended for use when the other shall fail. Historically it is known that the act of 1795 was passed with a view to a state of things then existing in the interior of Pennsylvania, when it became probable that the President of the United States would have to exert the authority of the general government immediately on detached portions of the officers or militia of the Union, to aid in the execution of the laws of

1820.

Houston
v.
Moore.

the United States. And instances may still occur in which the exercise of that power may become necessary for the same purpose. But, whenever bodies of militia have been called forth for the purposes of general defence, it is believed, that in no instance has it been done otherwise than by requisition, the only mode practised toward the States from the commencement of the revolution to the present day. That it was the mode intended to be pursued in this case, is obvious from the perusal of the letter of the Secretary of War to the Governor of Pennsylvania.[a] The words made use of are: " The President

*a Letter from the Secretary of War, to the Governor of Pennsylvania.*

" War Department, July 4, 1814.

" SIR,

" The late pacification in Europe offers to the enemy a large disposable force, both naval and military, and with it the means of giving to the war here, a character of new and increased activity and extent.

" Without knowing, with certainty, that such will be its application, and still less, that any particular point or points will become objects of attack ; the President has deemed it advisable, as a measure of precaution, to strengthen ourselves on the line of the Atlantic ; and (as the principal means of doing this will be found in the militia) to invite the executives of certain States to organize and hold in readiness for immediate service a corps of ninety-three thousand five hundred men, under the laws of the 28th of February, 1795, and the 18th of April, 1814.

" The enclosed detail will show your Excellency what, under this requisition, will be the quota of Pennsylvania. As far as volunteer uniform companies can be found, they will be preferred. The expediency of regarding (as well in the designa-

has deemed it advisable to invite the Executives of certain States to organize," &c. : Words which no military man would construe into a military command.

It is true, that this letter also refers to the acts of 1795 and 1814, as the authority under which the requisition is made, and the act of 1795 authorises the President to issue *his order* for that purpose: but this makes no difference in the case ; it only leaves him the power of proceeding by *order* if he thinks proper, without enjoining that mode, or depriving him of the option to pursue the other mode as long as the principles upon which the States acted were such as to render it advisable. Or, if the construction be otherwise, the result only will be, that the President has not pursued the mode pointed out by that act, and, therefore, has not brought the case within it.

But suppose the letter of the Secretary of War was intended by him to operate as an order, (although I cannot believe that Congress ever intended *an order* should issue immediately to the Governor of a

tions of the militia, as of their places of rendezvous,) the points, the importance or exposure of which will be most likely to attract the views of the enemy, need but be suggested.

" A report of the organization of your quota, when completed, and of its place, or places of rendezvous, will be acceptable.

" I have the honour to be, &c.
(Signed) " JOHN ARMSTRONG.

" P. S. The points to be defended, by the quota from Pennsylvania, will be the shores of the Delaware, Baltimore, and this city."

State,) how is this individual made punishable under the acts of 1795 and 1814?

The doctrine must be admitted, that Congress might, if they thought proper, have authorized the issuing of the President's order even to the Governor. For when the constitution of Pennsylvania makes her Governor commander in chief of the militia, it must subject him in that capacity (at least when in actual service) to the orders of him who is made commander in chief of all the militia of the Union. Yet if he is to be addressed in that capacity, and not as the general organ or representative of the State sovereignty, surely he has a right to be apprised of it. But is he then to be charged as a delinquent? Where is the law that has provided, or can provide, a Court Martial for his trial? And where is the law that would oblige him to consider such a letter as this a military order? It would then seem somewhat strange, if he, to whom this letter was immediately addressed, received no *order* from the President, that one to whom his order was transmitted through fifty grades, should yet be adjudged to have disobeyed *the President's order.*

But the situation of the private in this case, is still more favourable. It must be recollected we are now construing a penal statute. And the criminality of the person charged, depends altogether on the 5th section of the act of 1795. The 1st section of the act of 1814, makes no difference in this particular, inasmuch as it does no more than create a tribunal for the trial of crimes, and supposes the commission of such crimes to be against the provisions of some existing law. *The command of the President* then,

I hold to have been indispensable to the creation of an offence under the 5th section of this act. But how the President could, in the actual state of things, have issued such a command to the private, consistently with the provisions of this act, it is not easy to show. For, by the section immediately preceding the 5th, it is provided, " That no officer, non-commissioned officer or private of the militia, shall be compelled to serve more than three months, after his arrival at the place of rendezvous, in any one year, *nor more than in due rotation with every other able bodied man of the same rank in the battalion to which he belongs.*" Now, what was meant by *due rotation?* and how was the President's order to reach the individual without previously establishing this *due rotation?* I admit, that this rotation may have been established, through the aid of a State law ; but it became indispensable that such law should have been authorized or adopted by some law of Congress ; and there exists no law that I know of, either authorizing or requiring the designation or distribution by the States, which this law contemplates. On a call of the whole militia, there would have been no difficulty ; but in the case of a partial call, some designation legally known to the President became indispensable, before he could issue his orders with that precision which may well be required in a criminal prosecution. And this probably operated as forcibly as considerations of comity, in determining the government to proceed by the ancient mode of requisition, instead of addressing the executive of Pennsylvania in the language of command and au-

thority ; if, indeed, (what I will not readily admit,) the act was ever intended to apply to the case of an immediate order to the executive.

Pursuing the same course of reasoning a little further, we shall also be led to the conclusion, that neither could there be a Court constituted by a law of the United States for the trial of this offender. I hold it unquestionable, that whenever, in the statutes of any government, a general reference is made *to law*, either implicitly or expressly, that it can only relate to the laws of the government making this reference. Now the only act which it is pretended vests any Court with jurisdiction of offences created by the 5th section of the act of 1795, as to persons not yet mustered into service, is the 1st section of the act of 1814. The 4th and 6th sections of the act of 1795, taken together, furnish Courts Martial for the trial of offences committed by militia *employed* by the United States ; and the act of 1814, I admit, was intended to act upon the offences of those who were not yet in actual service, but had been *called into service.* Can it, on any legal principle, be so construed as to answer the end proposed ? The words are, " That Courts Martial for the trial of militia, drafted, detached and called forth for the service of the United States, shall be appointed," &c. But how drafted, detached, and called forth ? Under the laws of the United States, or of Russia ? For the laws of the States, unless adopted by Congress, are no more the laws of the United States than those of any foreign power. There is nothing in this act, or any other act, that designates the drafting, and detaching, or

calling forth, there expressed as the grounds of jurisdiction, as a drafting, &c. under the laws of a State. Nor would it have had such a drafting, &c. in view, if it was intended to provide for punishing offences against the provisions of the act of 1795; for, in that act it is required to be a calling forth by the President, not by State authority. And this suggests the only reasonable exposition that can be given it, consistent with the principle, that it must be a drafting, detaching, and calling forth under laws of the United States. If we can find a sensible and consistent exposition, we are bound to adopt it as the only one intended.

I have no doubt, that under the powers given the President by the act of 1795, and under the restriction contained in the 4th section of that act, it was in the power of the President to have issued orders to the Adjutant General of Pennsylvania, to bring into the field this quota of militia, and to have prescribed the manner in which they should be drafted and detached ; and had this been done, every thing would have been sensible and consistent, and the exigencies of both these laws would have been satisfied. It is obvious, that the act of 1814 recognizes the construction which makes the *drafting*, and *detaching*, as necessary to precede the calling forth ; and if the power to call forth existed in the President alone, it would seem that the other subordinate, but necessary ancillary powers to which this act has relation, must have existed in him also, and could be exercised by him, or under his authority only. Under this view of the subject, I am of

1820.

Houston
v.
Moore.

opinion, that a Court Martial constituted under this act of April 18th, 1814, could not legally have tried this individual, because he was not drafted and detached under the meaning of that act, taken in connexion with the act of 1795. Neither, in my opinion, was the calling forth such as was in the contemplation of that act. In addition to the reasons already given for this opinion, exists this obvious consideration. The calling forth authorized by that act is to be expressed by an order from the President. It is disobedience to such an order alone that is made punishable by that act. Now, though it be unquestionable that this order may be communicated through any proper organ, yet it must be communicated to the individual as an order from the President, or he is not brought within the enactment of the law, nor put on his guard against incurring the penalty. But, from first to last, the whole case makes out an offence against the orders of the Governor of Pennsylvania. It does not appear, that the order communicated to the individual was made to assume the form of an order from the President; and how, in that case, he could have been held guilty of having violated *an order from the President*, it is not easy to conceive.

For these reasons I am very clearly of opinion, that neither the United States, nor the plaintiff in error, can complain of the infraction of any constitutional right, if the State did constitute a Court for trying offences against the laws of the United States, or ingraft those laws into its own code, and make offences against the United States punishable in its Courts; that if the individual has any cause of com-

plaint, it is between him and his own State government : And that even were it otherwise, the plaintiff in error does not make out such a case here ; inasmuch as the general government could not have had it in contemplation to bring into operation the penal provisions of the act of 1795, and if they had, that they did not pursue the steps indispensable for that purpose ; therefore, that the Court Martial by which the plaintiff in error was tried, was really acting wholly under the authority of State laws, punishing State offences.

But it is contended, that if the States do possess this power over the militia, they may abuse it. This is a branch of the exploded doctrine, that within the scope in which Congress may legislate, the States shall not legislate. That they cannot, when legislating within that ceded region of power, run counter to the laws of Congress, is denied by no one; but, as I before observed, to reason against the exercise of this power from the possible abuse of it, is not for a court of justice. When instances of this opposition occur, it will be time enough to meet them. The present was an instance of the most honourable and zealous co-operation with the general government. The legislature of Pennsylvania, influenced, no doubt, by views similar to those in which I have presented the subject, saw the defects in the means of coercing her citizens into the service ; and, unwilling to bear the imputation of lukewarmness in the common cause, legislated on the occasion just as far as the laws of the United States were defective, or not brought into operation. And to vindicate her disinterestedness, she even gratui-

tously surrenders to the United States the fines to be inflicted. To have paused on legal subtleties with the enemy at her door, or to have shrunk from duty under shelter of pretexts which she could remove, would have been equally inconsistent with her character for wisdom and for candour.

I will make one further observation in order to prevent myself from being misunderstood. I have observed, that the Governors of States, as military commanders, must be considered as subordinate to the President: I do not mean to intimate, nor have I the least idea, that the act of 1795 gives authority to the President to issue an order to a Governor in that capacity. I hold the opinion to be absurd ; for he comes not within the idea of a *militia officer* in the language of that act. If he is so, what is his grade ? He will not be included under any title of rank, known to the laws of the United States, from the highest to the lowest. And how is he to be tried ? What is his pay ?—what his punishment ? An act which authorizes an *order* for militia, obviously authorizes *a requisition*. And if the purposes of the general government could as well be subserved by depending on the State authority for calling out the militia, there was no reason against resorting to that authority for the purpose. But the power of *ordering out* the militia is an alternative given to the President when the other is too circuitous or likely to fail. In that case, the President may address himself to the Executive ; and having obtained through him the necessary information relative to the distribution and organization of the militia, may proceed,

under his own immediate orders, to draft and detach the numbers wanted. And thus every thing in the act becomes sensible, consistent, and adequate to the purposes in view, with the sole defect intended to have been remedied by the 1st section of the act of 1814.

In this case, it will be observed, that there is no point whatever decided, except that the fine was constitutionally imposed upon the plaintiff in error. The course of reasoning by which the judges have reached this conclusion are various, coinciding in but one thing, viz., that there is no error in the judgment of the State Court of Pennsylvania.

Mr. Justice STORY. The only question which is cognizable by this Court upon this voluminous record, arises from a very short paragraph in the close of the bill of exceptions. It there appears that the plaintiff prayed the State Court of Common Pleas to instruct the jury, that the first, second, and third paragraphs of the 21st section of the statute of Pennsylvania of the 28th of March, 1814, "so far as they related to the militia called into the service of the United States, under the laws of Congress, and who failed to obey the orders of the President of the United States, are contrary to the Constitution of the United States and the laws of Congress made in pursuance thereof, and are, therefore, null and void." The Court instructed the jury that these paragraphs were not contrary to the constitution or laws of the United States, and were, therefore, not null and void. This opinion has been

affirmed by the highest State tribunal of Pennsylvania, and judgment has been there pronounced in pursuance of it in favour of the defendant. The cause stands before us upon a writ of error from this last judgment; and the naked question for us to decide is, whether the paragraphs alluded to are repugnant to the constitution or laws of the United States; if so, the judgment must be reversed; if otherwise, it ought to be affirmed.

Questions of this nature are always of great importance and delicacy. They involve interests of so much magnitude, and of such deep and permanent public concern, that they cannot but be approached with uncommon anxiety. The sovereignty of a State in the exercise of its legislation is not to be impaired, unless it be clear that it has transcended its legitimate authority; nor ought any power to be sought, much less to be adjudged, in favour of the United States, unless it be clearly within the reach of its constitutional charter. Sitting here, we are not at liberty to add one jot of power to the national government beyond what the people have granted by the constitution; and, on the other hand, we are bound to support that constitution as it stands, and to give a fair and rational scope to all the powers which it clearly contains.

The constitution containing a grant of powers in many instances similar to those already existing in the State governments, and some of these being of vital importance also to State authority and State legislation, it is not to be admitted, that a mere grant of such powers in affirmative terms to Congress, does,

*per se,* transfer an exclusive sovereignty on such sub-
jects to the latter.   On the contrary, a reasonable in-
terpretation of that instrument necessarily leads to
the conclusion, that the powers so granted are never
exclusive of similar powers existing in the States,
unless where the constitution has expressly in terms
given an exclusive power to Congress, or the exer-
cise of a like power is prohibited to the States, or
there is a direct repugnancy or incompatibility in the
exercise of it by the States.   The example of the
first class is to be found in the *exclusive* legislation
delegated to Congress over places purchased by the
consent of the legislature of the State in which the
same shall be, for forts, arsenals, dock-yards, &c. ;
of the second class, the prohibition of a State to coin
money or emit bills of credit ; of the third class, as
this Court have already held, the power to establish
an uniform rule of naturalization,[a] and the delegation
of admiralty and maritime jurisdiction.[b]   In all other
cases not falling within the classes already mention-
ed, it seems unquestionable that the States retain
concurrent authority with Congress, not only upon
the letter and spirit of the eleventh amendment of
the constitution, but upon the soundest principles of
general reasoning.   There is this reserve, however,
that in cases of concurrent authority, where the laws
of the States and of the Union are in direct and ma-
nifest collision on the same subject, those of the
Union being " the supreme law of the land," are of

a Chirac *v.* Chirac, 2 *Wheat.* 259. 269.
b Martin *v.* Hunter, 1 *Wheat.* 304. 337.   And see *The Fede-
ralist,* No. 32.

paramount authority, and the State laws, so far, and so far only, as such incompatibility exists, must necessarily yield.

Such are the general principles by which my judgment is guided in every investigation on constitutional points.    I do not know that they have ever been seriously doubted.    They commend themselves by their intrinsic equity, and have been amply justified by the opinions of the great men under whose guidance the constitution was framed, as well as by the practice of the government of the Union.    To desert them would be to deliver ourselves over to endless doubts and difficulties; and probably to hazard the existence of the constitution itself.    With these principles in view, let the question now before the Court be examined.

The constitution declares, that Congress shall have power " to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions;" and " to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress."

It is almost too plain for argument, that the power here given to Congress over the militia, is of a limited nature, and confined to the objects specified in these clauses; and that in all other respects, and for all other purposes, the militia are subject to the control and government of the State authorities.    Nor can the reservation to the States of the appointment

of the officers and authority of the training the militia according to the discipline prescribed by Congress, be justly considered as weakening this conclusion. That reservation constitutes an exception merely from the power given to Congress " to provide for organizing, arming, and disciplining the militia ;" and is a limitation upon the authority, which would otherwise have devolved upon it as to the appointment of officers. But the exception from a given power cannot, upon any fair reasoning, be considered as an enumeration of all the powers which belong to the States over the militia. What those powers are must depend upon their own constitutions; and what is not taken away by the Constitution of the United States, must be considered as retained by the States or the people. The exception then ascertains only that Congress have not, and that the States have, the power to appoint the officers of the militia, and to train them according to the discipline prescribed by Congress. Nor does it seem necessary to contend, that the power " to provide for organizing, arming, and disciplining the militia," is exclusively vested in Congress. It is merely an affirmative power, and if not in its own nature incompatible with the existence of a like power in the States, it may well leave a concurrent power in the latter. But when once Congress has carried this power into effect, its laws for the organization, arming, and discipline of the militia, are the supreme law of the land; and all interfering State regulations must necessarily be suspended in their operation. It would certainly seem reasonable, that in the absence

of all interfering provisions by Congress on the subject, the States should have authority to organize, arm, and discipline their own militia.   The general authority retained by them over the militia would seem to draw after it these, as necessary incidents. If Congress should not have exercised its own power, how, upon any other construction, than that of a concurrent power, could the States sufficiently provide for their own safety against domestic insurrections, or the sudden invasion of a foreign enemy ?   They are expressly prohibited from keeping troops or ships of war in time of peace ; and this, undoubtedly, upon the supposition, that in such cases the militia would be their natural and sufficient defence.   Yet what would the militia be without organization, arms, and discipline ?   It is certainly not compulsory upon Congress to exercise its own authority upon this subject.   The time, the mode, and the extent, must rest upon its means and sound discretion.   If, therefore, the present case turned upon the question, whether a State might organize, arm, and discipline its own militia in the absence of, or subordinate to, the regulations of Congress, I am certainly not prepared to deny the legitimacy of such an exercise of authority.   It does not seem repugnant in its nature to the grant of a like paramount authority to Congress ; and if not, then it is retained by the States.   The fifth amendment to the constitution, declaring that " a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed," may not, perhaps, be thought to have any important bearing

on this point. If it have, it confirms and illustrates, rather than impugns the reasoning already suggested.

But Congress have, also, the power to provide " for governing such part of *the militia* as may be *employed* in the service of the United States." It has not been attempted in argument, to establish that this power is not exclusively in Congress; or that the States have a concurrent power of governing their own militia when in the service of the Union. On the contrary, the reverse has been conceded both here and before the other tribunals in which this cause has been so ably and learnedly discussed. And there certainly are the strongest reasons for this construction. When the militia is called into the actual service of the United States, by which I understand actual employment in service, the constitution declares, that the President shall be the commander in chief. The militia of several States may, at the same time, be called out for the public defence ; and to suppose each State could have an authority to govern its own militia in such cases, even subordinate to the regulations of Congress, seems utterly inconsistent with that unity of command and action, on which the success of all military operations must essentially depend. There never could be a stronger case put from the argument of public inconvenience, against the adoption of such a doctrine. It is scarcely possible, that any interference, however small, of a State under such circumstances in the government of the militia, would not materially embarrass, and directly, or indirectly, impugn the authority of the Union. In most cases there would be an utter re-

pugnancy.    It would seem, therefore, that a rational interpretation must construe this power as exclusive in its own nature, and belonging solely to Congress.

The remaining clause gives Congress power " to provide for calling forth the militia to execute the laws of the . Union, suppress insurrections, and repel invasions."    Does this clause vest in Congress an exclusive power, or leave to the States a concurrent power to enact laws for the same purposes?    This is an important question, bearing directly on the case before us, and deserves serious deliberation. The plaintiff contends, that the power is exclusive in Congress ; the defendant, that it is not.

In considering this question, it is always to be kept in view, that the case is not of a new power granted to Congress where no similar power already existed in the States.    On the contrary, the States in virtue of their sovereignty, possessed general authority over their own militia ; and the constitution carved out of that a specific power in certain enumerated cases.    But the grant of such a power is not necessarily exclusive, unless the retaining of a concurrent power by the States be clearly repugnant to the grant.    It does not strike me that there is any repugnancy in such concurrent power in the States. Why may not a State call forth its own militia in aid of the United States, to execute the laws of the Union, or suppress insurrections, or repel invasions ? It would certainly seem fit that a State might so do, where the insurrection or invasion is within its own territory, and directed against its own existence or authority ; and yet these are cases to which the pow-

er of Congress pointedly applies. And the execution of the laws of the Union within its territory may not be less vital to its rights and authority, than the suppression of a rebellion, or the repulse of an enemy. I do not say that a State may call forth, or claim under its own command, that portion of its militia which the United States have already called forth, and hold employed in actual service. There would be a repugnancy in the exercise of such an authority under such circumstances. But why may it not call forth, and employ the rest of its militia in aid of the United States, for the constitutional purposes? It could not clash with the exercise of the authority confided to Congress; and yet that it must necessarily clash with it in all cases, is the sole ground upon which the authority of Congress can be deemed exclusive. I am not prepared to assert, that a concurrent power is not retained by the States to provide for the calling forth its own militia as auxiliary to the power of Congress in the enumerated cases. The argument of the plaintiff is, that when a power is granted to Congress to legislate in specific cases, for purposes growing out of the Union, the natural conclusion is, that the power is designed to be exclusive.: That the power is to be exercised for the good of the whole, by the will of the whole, and consistent with the interests of the whole; and that these objects can no where be so clearly seen, or so thoroughly weighed as in Congress, where the whole nation is represented. But the argument proves too much; and pursued to its full extent, it would establish, that all the powers granted to Congress are

exclusive, unless where concurrent authority is expressly reserved to the States. But assuming the States to possess a concurrent power on this subject, still the principal difficulty remains to be considered. It is conceded on all sides, and is, indeed, beyond all reasonable doubt, that all State laws on this subject are subordinate to those constitutionally enacted by Congress, and that if there be any conflict or repugnancy between them, the State laws to that extent are inoperative and void. And this brings us to a consideration of the actual legislation of Congress, and of Pennsylvania, as to the point in controversy.

In the execution of the power to provide for the calling forth of the militia, it cannot well be denied, that Congress may pass laws to make its call effectual, to punish disobedience to its call, to erect tribunals for the trial of offenders, and to direct the modes of proceeding to enforce the penalties attached to such disobedience. In its very essence too, the offence created by such laws must be an offence exclusively against the United States, since it grows solely out of the breach of duties due to the United States, in virtue of its positive legislation. To deny the authority of Congress to legislate to this extent, would be to deny that it had authority to make all laws necessary and proper to carry a given power into execution; to require the end, and yet deny the only means adequate to attain that end. Such a construction of the constitution is wholly inadmissible.

The authority of Congress being then unquestionable, let us see to what extent, and in what

manner it has been exercised. By the act of the 28th of February, 1795, ch. 101., Congress have provided for the calling forth of the militia in the cases enumerated in the constitution. The first section provides, " that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation, or Indian tribe, it shall be lawful for the President of the United States *to call forth such number of the militia of the State or States,* most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and *to issue his orders* for that purpose, to such officer or officers of the militia as he shall think proper." It then proceeds to make a provision, substantially the same, in cases of domestic insurrections; and in like manner, the second section proceeds to provide for cases where the execution of the laws is opposed or obstructed by combinations too powerful to be suppressed by the ordinary course of judicial proceedings. The fourth section provides, that " the militia *employed* in the service of the United States shall be subject to the same rules and articles of war as the troops of the United States." The fifth section (which is very material to our present purpose) provides, " that every officer, non-commissioned officer, or private of the militia, *who shall fail to obey any of the orders of the President of the United States, in the cases before recited,* shall forfeit a sum not exceeding one year's pay, and not less than one month's pay, to be determined and adjudged by a Court Martial; and such officer shall, moreover, be liable to be cashiered by a sentence of a Court Martial, and be

1820.

Houston
v.
Moore.

1820.

Houston
v.
Moore.

incapacitated from holding a commission in the militia for a term not exceeding twelve months, at the discretion of the said Court; and such non-commissioned officers and privates shall be liable to be imprisoned by a like sentence, on failure of payment of the fines adjudged against them, for one calendar month for every five dollars of such fine." The sixth section declares, "that Courts Martial for the trial of militia, shall be composed of militia officers only." The seventh and eighth sections provide for the collection of the fines by the marshal and deputies, and for the payment of them when collected into the treasury of the United States.

The 2d section of the militia act of Pennsylvania, passed the 28th of March, 1814, provides, "that if any commissioned officer of the militia shall have neglected, or refused to serve, when called into actual service in pursuance of any order or requisition of the President of the United States, he shall be liable to the penalties defined in the act of Congress of the United States, passed on the 28th of February, 1795," and then proceeds to enumerate them; and then declares, "that each and every non-commissioned officer and private, who shall have neglected or refused to serve when called into actual service in pursuance of an order or requisition of the President of the United States, shall be liable to the penalties defined in the same act," and then proceeds to enumerate them. And to each clause is added, " or shall be liable to any penalty which may have been prescribed since the date of the passage of the said act, or which may hereafter be prescribed by any law

of the United States." It then further provides, that "within one month after the expiration of the time for which any detachment of militia shall have been called into the service of the United States, by, or in pursuance of orders from the President of the United States, the proper brigade inspector shall summon a general, or a regimental Court Martial, as the case may be, for the trial of such person or persons belonging to the detachment called out, who shall have refused or neglected to march therewith, or to furnish a sufficient substitute, or who, after having marched therewith, shall have returned without leave from his commanding officer, of which delinquents, the proper brigade inspector shall furnish to the said Court Martial an accurate list. And as soon as the said Court Martial shall have decided in each of the cases which shall be submitted to their consideration, the president thereof shall furnish to the marshal of the United States, or to his deputy, and also to the comptroller of the treasury of the United States, a list of the delinquents fined, in order that the further proceedings directed to be had thereon by the laws of the United States may be completed."

It is apparent, from this summary, that each of the acts in question has in view the same objects, the punishment of any persons belonging to the militia of the State, who shall be called forth into the service of the United States by the President, and refuse to perform their duty. Both inflict the same penalties for the same acts of disobedience. In the act of 1795, it is the failure " to obey the orders of the

1820.

Houston
v.
Moore.

President *in any of the cases before recited ;*" and those orders are such as he is authorized to give by the first and second sections of the act, viz. to " call forth" the militia to execute the laws, to suppress insurrections, and repel invasions. In the act of Pennsylvania, it is the neglect or refusal " *to serve when called into actual service,* in pursuance of any orders of the President," which orders can only be under the act of 1795. And to demonstrate this construction more fully, the delinquent is made liable to the penalties defined in the same act ; and this again is followed by a clause varying the penalties, so as to conform to those which from time to time may be inflicted by the laws of the United States for the same offence. So that there can be no reasonable doubt that the legislature of Pennsylvania meant to punish by its own Courts Martial, an offence against the United States created by their laws, by a substantial re-enactment of those laws in its own militia code.

No doubt has been here breathed of the constitutionality of the provisions of the act of 1795, and they are believed to be, in all respects, within the legitimate authority of Congress. In the construction, however, of this act, the parties are at variance. The plaintiff contends, that from the time of the calling forth of the militia by the President, it is to be considered as *ipso facto* " employed in the service of the United States," within the meaning of the constitution, and the act of 1795 ; and, therefore, to be exclusively governed by Congress. On the other hand, the defendant contends, that there is no distinction between the " calling forth," and the " employ-

ment in service" of the militia, in the act of 1795, both meaning actual mustering in service, or an effectual calling into service; that the States retain complete authority over the militia, notwithstanding the call of the President, until it is obeyed by going into service; that the exclusive authority of the United States does not commence until the drafted troops are mustered, and in the actual pay and service of the Union: and further, that the act of 1795 was never intended, by its language, to apply its penalties, except to militia in the latter predicament, leaving disobedience to the President's call to be punished by the States as an offence against State authority.

Upon the most mature reflection, it is my opinion, that there is a sound distinction between the " calling forth" of the militia, and their being in the " actual service" or " employment" of the United States, contemplated both in the constitution and acts of Congress. The constitution, in the clause already adverted to, enables Congress to provide for the government of such part of the militia " as may be *employed* in the service of the United States," and makes the President commander in chief of the militia, " when called into the *actual service* of the United States." If the former clause included the authority in Congress to call forth the militia, as being in virtue of the call of the President in actual service, there would certainly be no necessity for a distinct clause, authorizing it to provide for the calling forth of the militia; and the President would be commander in chief, not merely of the militia in actual service, but of the militia ordered into service.

The acts of Congress, also, aid the construction already asserted. The 4th section of the act of 1795, makes the militia "employed in the service of the United States," subject to the rules and articles of war; and these articles include capital punishments by Courts Martial. Yet one of the amendments (art. 5.) to the constitution, prohibits such punishments, "unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces," or in " the militia *when in actual service, in time of war, or public danger.*" To prevent, therefore, a manifest breach of the constitution, we cannot but suppose that Congress meant, (what, indeed, its language clearly imports,) in the 4th section, to provide only for cases of actual employment. The act of the 2d of January, 1795, ch. 74. provides for the pay of the militia " when called into actual service," commencing it on the day of their appearance at the place of rendezvous, and allowing a certain pay for every fifteen miles travel from their homes to that place. The 97th article of the rules and articles of war (act of 10th of April, 1806, ch. 20.) declares, that the officers and soldiers of any troops, whether militia or others, being mustered, and in the pay of the United States, shall, at all times, and in all places, "*when joined, or acting in conjunction with the regular forces*" of the United States, be governed by these articles, and shall be subject to be tried by Courts Martial, in like manner with the officers and soldiers in the regular forces, save only that such Courts Martial shall be composed entirely of militia officers. And the act of the 18th of

April, 1814, (ch. 141.) supplementary to that of 1795, provides for like Courts Martial for the trial of militia, drafted, detached, and called forth for the service of the United States, " whether *acting* in conjunction with the regular forces *or otherwise*." All these provisions for the government, payment, and trial of the militia, manifestly contemplate that the militia are in actual employment and service, and not merely that they have been " called forth," or ordered forth, and had failed to obey the orders of the President. It would seem almost absurd to say that these men who have performed no actual service, are yet to receive pay; that they are " employed" when they refuse to be employed in the public service; that they are " *acting*" in conjunction with the regular forces or otherwise, when they are not embodied to act at all; or that they are subject to the rules and articles of war as troops organized and employed in the public service, when they have utterly disclaimed all military organization and obedience. In my judgment, there are the strongest reasons to believe, that by employment " in the service," or, as it is sometimes expressed, " in the actual service" of the United States, something more must be meant than a mere calling forth of the militia. That it includes some acts of organization, mustering, or marching done or recognised, in obedience to the call in the public service. The act of 1795 is not in its terms compulsive upon any militia to serve; but contemplates an option in the person drafted, to serve or not to serve; and if he pay the penalty in-

flicted by the law, he does not seem bound to per-
form any military duties.

Besides, the terms " call forth" and " employed
in service," cannot, in any appropriate sense, be said
to be synonimous.   To suppose them used to signify
the same thing in the constitution, and acts of Con-
gress, would be to defeat the obvious purposes of
both.   The constitution, in providing for the calling
forth of the militia, necessarily supposes some act to
be done before the actual employment of the militia ;
a requisition to perform service, a call to engage in a
public duty.   From the very nature of things, the
call must precede the service ; and to confound them
is to break down the established meaning of lan-
guage, and to render nugatory a power without which
the militia can never be compelled to serve in defence
of the Union.   For of what constitutional validity
can the act of 1795 be, if the sense be not what I
have stated ?   If Congress cannot provide for a pre-
liminary call, authorizing and requiring the service,
how can it punish disobedience to that call ?   The
argument that endeavours to establish such a propo-
sition, is utterly without any solid foundation.   We
do not sit here to fritter away the constitution upon
metaphysical subtleties.

Nor is it true that the act of 1795 confines its
penalties to such of the militia as are in actual ser-
vice, leaving those who refuse to comply with the
orders of the President to the punishment that the
State may choose to inflict for disobedience.   On the
contrary, if there be any certainty in language, the
5th section applies exclusively to those of the militia

who are " called forth" by the President, and fail to obey his orders, or, in other words, who refuse to go into the actual service of the United States. It inflicts no penalty in any other case ; and it supposes, and justly, that all the cases of disobedience of the militia, while in actual service, were sufficiently provided for by the 4th section of the act, they being thereby subjected to the rules and articles of war. It inflicts the penalty too, as we have already seen, in the identical cases, and none other, to which the paragraphs of the militia act of Pennsylvania now in question pointedly address themselves; and in the identical case for which the present plaintiff was tried, convicted, and punished, by the State Court Martial. So that if the defendant's construction of the act of 1795 could prevail, it would not help his case. All the difficulties as to the repugnancy between the act of Congress and of Pennsylvania, would still remain, with the additional difficulty, that the Court would be driven to say, that the mere act of calling forth put the militia, *ipso facto*, into actual service, and so placed them exclusively under the government of Congress.

In the remarks which have already been made, the answer to another proposition stated by the defendant is necessarily included. The offence to which the penalties are annexed in the 4th section of the act of 1795, is not an offence against State authority, but against the United States, created by a law of Congress, in virtue of a constitutional authority, and punishable by a tribunal which it has selected, and which it can change at its pleasure.

That tribunal is a Court Martial ; and the defendant contends, that as no explanatory terms are added, a State Court Martial is necessarily intended, because the laws of the Union have not effectually created any Court Martial, which, sitting under the authority of the United States, can in all cases try the offence. It will at once be seen that the act of 1795 has not expressly delegated cognizance of the offence to a State Court Martial, and the question naturally arises, in what manner then can it be claimed ? When a military offence is created by an act of Congress to be punished by a Court Martial, how is such an act to be interpreted ? If a similar clause were in a State law, we should be at no loss to give an immediate and definite construction to it, viz., that it pointed to a State Court Martial—And why ? Because the offence being created by State legislation, to be executed for State purposes, must be supposed to contemplate in its execution such tribunals as the State may erect, and control, and confer jurisdiction upon. A State legislature cannot be presumed to legislate as to foreign tribunals ; but must be supposed to speak in reference to those which may be reached by its own sovereignty. Precisely the same reasons must apply to the construction of a law of the United States. The object of the law being to provide for the exercise of a power vested in Congress by the constitution, whatever is directed to be done must be supposed to be done, unless the contrary be expressed, under the authority of the Union. When, then, a Court Martial is spoken of in general terms in the act of 1795. the reasonable interpre-

tation is, that it is a Court Martial to-be organized under the authority of the United States—a Court Martial whom Congress may convene and regulate. There is no pretence to say, that Congress can compel a State Court Martial to convene and sit in judgment on such offence. Such an authority is no where confided to it by the constitution. Its power is limited to the few cases already specified, and these most assuredly do not embrace it ; for it is not an implied power necessary or proper to carry into effect the given powers. The nation may organize its own tribunals for this purpose; and it has no necessity to resort to other tribunals to enforce its rights. If it do not choose to organize such tribunals, it is its own fault ; but it is not, therefore, imperative upon a State tribunal to volunteer in its service. The 6th section of the same act comes in aid of this most reasonable construction. It declares that Courts Martial for the trial of militia shall be composed of militia officers only, which plainly shows that it supposed that regular troops and officers were in the same service ; and yet, it is as plain that this provision would be superfluous, if State Courts Martial were solely intended, since the States do not keep, and ordinarily have no authority to keep, regular troops, but are bound to confine themselves to militia. It might with as much propriety be contended, that the Courts Martial for the trial of militia under the 97th article of the rules and articles of war, are to be State Courts Martial. The language of that article, so far as respects this point, is

almost the same with the clause now under conside-
ration.

As to the argument itself, upon which the defend-
ant erects his construction of this part of the act,
its solidity is not admitted. It does not follow, be-
cause Congress have neglected to provide adequate
means to enforce their laws, that a resulting trust is
reposed in the State tribunals to enforce them. If an
offence be created of which no Court of the United
States has a vested cognizance, the State Court may
not, therefore, assume jurisdiction, and punish it. It
cannot be pretended that the States have retained
any power to enforce fines and penalties created by
the laws of the United States in virtue of their gene-
ral sovereignty, for that sovereignty did not original-
ly attach on such subjects. They sprung from the
Union, and had no previous existence. It would be
a strange anomaly in our national jurisprudence to
hold the doctrine, that because a *new* power created
by the constitution of the United States was not ex-
ercised to its full extent, therefore the States might
exercise it by a sort of process in aid. For instance,
because Congress decline " to borrow money on the
credit of the United States," or " to constitute tribu-
nals inferior to the Supreme Court," or "to make rules
for the government and regulation of the land and
naval forces," or exercise either of them defectively,
that a State might step in, and by its legislation supply
those defects, or assume a general jurisdiction on
these subjects. If, therefore, it be conceded, that
Congress have not as yet legislated to the extent of
organizing Courts Martial for the trial of offences
created by the act of 1795, it is not conceded that

therefore State Courts Martial may, in virtue of State laws, exercise the authority, and punish offenders. Congress may hereafter supply such defects, and cure all inconveniences.

It is a general principle too in the policy, if not the customary law of nations, that no nation is bound to enforce the penal laws of another within its own dominions. The authority naturally belongs, and is confided, to the tribunals of the nation creating the offences. In a government formed like ours, where there is a division of sovereignty, and, of course, where there is a danger of collision from the near approach of powers to a conflict with each other, it would seem a peculiarly safe and salutary rule, that each government should be left to enforce its own penal laws in its own tribunals. It has been expressly held by this Court, that no part of the criminal jurisdiction of the United States can consistently with the contsitution be delegated by Congress to State tribunals ;[a] and there is not the slightest inclination to retract that opinion. The judicial power of the Union clearly extends to all such cases. No concurrent power is retained by the States, because the subject matter derives its existence from the constitution ; and the authority of Congress to delegate it cannot be implied, for it is not necessary or proper in any constitutional sense. But even if Congress could delegate it, it would still remain to be shown that it had so done. We have seen that this cannot

[a] Martin v Hunter, 1 *Wheat. Rep.* 304. 337. S. P. United States v. Lathrop, 17 *Johns. Rep.* 4.

be correctly deduced from the act of 1795; and we are, therefore, driven to decide, whether a State can, without such delegation, constitutionally assume and exercise it.

It is not, however, admitted, that the laws of the United States have not enabled Courts Martial to be held under their own authority for the trial of these offences, at least when there are militia officers acting in service in conjunction with regular troops. The 97th article of war gives an authority for the trial of militia in many cases; and the act of the 18th of April, 1814, ch. 141. (which has now expired,) provided, as we have already seen, for cases where the militia was acting alone. To what extent these laws applied is not now necessary to be determined. The subject is introduced solely to prevent any conclusion that they are deemed to be wholly inapplicable. Upon the whole, I am of opinion, that the Courts Martial intended by the act of 1795, are not State Courts Martial, but those of the United States; and this is the same construction which has been already put upon the same act by the Supreme Court of Pennsylvania.[a]

What, then, is the state of the case before the Court? Congress, by a law, declare that the officers and privates of the militia who shall, when called forth by the President, fail to obey his orders, shall be liable to certain penalties, to be adjudged by a Court Martial convened under its own authority. The legislature of Pennsylvania inflict the same penalties for

a Ex parte Bolson, 5 Hall's Amer. Law Journal, 476.

the same disobedience, and direct these penalties to be adjudged by a State Court Martial called exclusively under its own authority. The offence is created by a law of the United States, and is solely against their authority, and made punishable in a specific manner; the legislature of Pennsylvania, without the assent of the United States, insist upon being an auxiliary, nay, as the defendant contends, a principal, if not a paramount, sovereign, in its execution. This is the real state of the case; and it is said, without the slightest disrespect for the legislature of Pennsylvania, who in passing this act were, without question, governed by the highest motives of patriotism, public honour, and fidelity to the Union. If it has transcended its legitimate authority, it has committed an unintentional error, which it will be the first to repair, and the last to vindicate. Our duty compels us, however, to compare the legislation, and not the intention, with the standard of the constitution.

It has not been denied, that Congress may constitutionally delegate to its own Courts exclusive jurisdiction over cases arising under its own laws. It is, too, a general principle in the construction of statutes, that where a penalty is prescribed to be recovered in a special manner, in a special Court, it excludes a recovery in any other mode or Court. The language is deemed expressive of the sense of the legislature, that the jurisdiction shall be exclusive. In such a case, it is a violation of the statute for any other tribunal to assume jurisdiction. If, then, we strip the case before the Court of all unnecessary

appendages, it presents this point, that Congress had declared that its own Courts Martial shall have exclusive jurisdiction of the offence; and the State of Pennsylvania claims a right to interfere with that exclusive jurisdiction, and to decide in its own Courts upon the merits of every case of alleged delinquency. Can a more direct collision with the authority of the United States be imagined? It is an exercise of concurrent authority where the laws of Congress have constitutionally denied it. If an act of Congress be the supreme law of the land, it cannot be made more binding by an affirmative re-enactment of the same act by a State legislature. The latter must be merely inoperative and void; for it seeks to give sanction to that which already possesses the highest sanction.

What are the consequences, if the State legislation in the present case be constitutional? In the first place, if the trial in the State Court Martial be on the merits, and end in a condemnation or acquittal, one of two things must follow, either that the United States' Courts Martial are thereby devested of their authority to try the same case, in violation of the jurisdiction confided to them by Congress; or that the delinquents are liable to be twice tried and punished for the same offence, against the manifest intent of the act of Congress, the principles of the common law, and the genius of our free government. In the next place, it is not perceived how the right of the President to pardon the offence can be effectually exerted; for if the State legislature can, as the defendant contends, by its own enactment, make it a State offence, the pardoning power of the State

can alone purge away such an offence. The President has no authority to interfere in such a case. In the next place, if the State can re-enact the same penalties, it may enact penalties substantially different for the same offence, to be adjudged in its own Courts. If it possess a concurrent power of legislation, so as to make it a distinct State offence, what punishments it shall impose must depend upon its own discretion. In the exercise of that discretion, it is not liable to the control of the United States. It may enact more severe or more mild punishments than those declared by Congress. And thus an offence originally created by the laws of the United States, and growing out of their authority, may be visited with penalties utterly incompatible with the intent of the national legislature. It may be said that State legislation cannot be thus exercised, because its concurrent power must be in subordination to that of the United States. If this be true, (and it is believed to be so,) then it must be upon the ground that the offence cannot be made a distinct State offence, but is exclusively created by the laws of the United States, and is to be tried and punished as Congress has directed, and not in any other manner or to any other extent. Yet the argument of the defendant's counsel might be here urged, that the State law was merely auxiliary to that of the United States; and that it sought only to enforce a public duty more effectually by other penalties, in aid of those prescribed by Congress. The repugnancy of such a State law to the national authority would, nevertheless, be manifest, since it would seek

1820.

Houston
v.
Moore.

to punish an offence created by Congress, different-
ly from the declared will of Congress. And the
repugnancy is not in my judgment less manifest,
where the State law undertakes to punish an offence
by a State Court Martial, which the law of the
United States confines to the jurisdiction of a national
Court Martial.

The present case has been illustrated in the argu-
ment of the defendant's counsel, by a reference to
cases in which State Courts under State laws exer-
cise a concurrent jurisdiction over offences created
and punished by the laws of the United States.
The only case of this description which has been
cited at the bar, is the forgery of notes of the Bank
of the United States, which by an act of Congress
was punished by fine and imprisonment, and which
under State laws has also been punished in some
State Courts, and particularly in Pennsylvania.[a]   In
respect to this case, it is to be recollected, that there
is an express proviso in the act of Congress, that no-
thing in that act should be construed to deprive the
State Courts of their jurisdiction under the State
laws over the offences declared punishable by that
act.  There is no such proviso in the act of 1795,
and, therefore, there is no complete analogy to sup-
port the illustration.

That there are cases in which an offence particu-
larly aimed against the laws or authority of the
United States may, at the same time, be directed
against State authority also, and thus be within the

a See White v. Commonwealth, 4 *Binn. Rep.* 418.  Living-
ston v. Van Ingen, 9 *Johns. Rep.* 507. 567.

legitimate reach of State legislation, in the absence of national legislation on the same subject, I pretend not to affirm, or to deny. It will be sufficient to meet such a case when it shall arise. But that an offence against the constitutional authority of the United States can, after the national legislature has provided for its trial and punishment, be cognizable in a State Court, in virtue of a State law creating a like offence, and defining its punishment, without the consent of Congress, I am very far from being ready to admit. It seems to me, that such an exercise of State authority is completely open to the great objections which are presented in the case before us. Take the case of a capital offence, as for instance, treason against the United States : can a State legislature vest its own Courts with jurisdiction over such an offence, and punish it either capitally or otherwise ? Can the national Courts be ousted of their jurisdiction by a trial of the offender in a State Court? Would an acquittal in a State Court be a good bar upon an indictment for the offence in the national Courts ? Can the offender, against the letter of the constitution of the United States, " be subject for the same offence, to be twice put in jeopardy of life or limb ?" These are questions which, it seems to me, are exceedingly difficult to answer in the affirmative. The case, then, put by the defendant's counsel, clears away none of the embarrassments which surround their construction of the case at the bar of the Court.

Upon the whole, with whatever reluctance, I feel myself bound to declare, that the clauses of the mi-

1820.

U. States
v.
Wiltberger.

litia act of Pennsylvania now in question, are repug-
nant to the constitutional laws of Congress on the
same subject, and are utterly void; and that, there-
fore, the judgment of the State Court ought to be
reversed.    In this opinion I have the concurrence of
one of my brethren.

Judgment affirmed.