Harper J.
No question has been made respecting the constitutional authority of the congress of the United States to establish a bank. This has, in fact, been conceded on the part of the defendants representing the State. It would therefore be improper to go into any investigation of that subject. Supposing the establishing of the bank to be constitutional, the question arises as to the constitutionality of the tax, imposed by the State legislature, on the dividends of its stock received by citizens of this State.
There is no question, in general, respecting the right of the State to tax all persons, and property, within its jurisdiction. It taxes income derived from professions, and from other sources; and what forbids it to tax income derived from stock of the Bank of the United States 1 The law of a State is said to be void, first, when the power, claimed to be exercised by it has been granted exclusively, in terms, to the federal government; secondly, where the power has been prohibited to the States ; and thirdly, where the power has been granted, and although not prohibited to the States, yet having been exercised by congress, the exercise of the power of the State is incompatible with the act of the federal government. Such is the doctrine laid down in Sturges v. Crowninshield, 4 Wheat. 122, and in Houston v. Moore, 5 Wheat. 1.
If the exercise of the power be not incompatible, but the laws of both governments may have effect; then it should seem that both ought to be permitted to operate. In the present case, it is not even urged, that the tax imposed by the State is incompatible with the existence of the bank; or that the laws of both governments may not have effect. The argument however, is, that if the State may tax the dividends owe per cent,, it may tax to any amount, and thus banish the stock from the State. Perhaps it might be said, that although the State should tax the dividends so highly, as to banish the stock from the State, the bank might still exist, and answer all the fiscal purposes of the government; nay, that, considered merely as a banking institution, it might perhaps do as profitable a business as it does at present. The State would only deprive its citizens of a convenient method of investing their funds; and this might be, although the stock should be banished from many States, or the stock were owned exclusively by foreigners.
*672 But notwithstanding the high authority by which it is support-1 ed, and the modesty with which it becomes me to speak of the decisions of such a tribunal, as the Supreme Court of the United States, I think the reasoning itself utterly vicious, unsound, and dangerous. With respect to authority, it might be enough to say, that, in the cases relied on, M’Cullough v. Maryland, 4 Wheat. 316, and Weston v. the City Council, 2 Peters, 449, the case now before us is expressly excepted by the opinion of the Court. In the former case, the Chief Justice says, “ this opinion does not deprive the States of any resources, which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the real property Within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State.” 4 Wheat. 436. And in Weston v. the City Council, “ all subjects, over which the sovereign power of a State, extends, are objects of taxation.” 2 Peters, 467. It can hardly be doubted, but that the sovereign power of a State extends over property in the hands of its citizens.
It is not my purpose to call in question the correctness of the decisions in the cases, to which I have referred; but I cannot express my own views on the matter before me, without an examination of some of the reasoning, on which those determinations appear to have been founded. In M’Cullough v. Maryland, the scope of the reasoning is, that the power to tax the bank, at all, is the power to tax to any amount, and consequently to banish or destroy it. Congress, having power to create a bank, must have the power to preserve it, which cannot be, if it is subject to State taxation: and the Court is not driven to determine, what degree of taxation is legitimate, a task so unfit for the judicial department. And in Weston v. the City Council, it is said, that a State has no power to retard, impede, burden, or in any manner control, a constitutional law of the United States. There is no one less disposed than myself to withhold from the federal government any of its just powers, which enable it to execute, in the most effectual manner, the important purposes for which it was instituted; but, that the powers reserved to the State should be kept unimpaired, is perhaps not less important. If, as has been said, the legitimate purpose of government is, the' *673 protection of its citizens, in the exercise of all their physical and intellectual' faculties; and to the federal government is committed their protection from foreign nations, or from the-effects of collision between the States themselves, as governments; whilst , „ tne States are to protect them from all other injustice, fraud, and violence; then the functions of the State governments are, perhaps, of more importance, as their protection will be more frequently invoked. In all human institutions evil is mixed with good. Our system of government is a complicated one, producing, as we suppose, important benefits; and it cannot be, but that difficulties and collisions will arise, which would not occur under a more simple form of polity. Something must be left to mutual moderation, and forbearance, and the sense of mutual interest. Experience must teach us to correct the defects of our system. If the State has no right to retard, impede, burden, or in any manner control, an act of the federal government, then, indeed, the difficulties are swept out of the way ; but, it seems to me, that this is effected by sweeping all independent State authority along with them.
The true distinction appears to me to be 'that, quoted by the Attorney General from the Federalist, between a direct, necessary, and inevitable, conflict of powers, and one that is merely consequential, casual, and mitigated. If congress has power to establish a bank, and a State should impose a penalty on the exercise of the franchise, with the avowed purpose of preventing its establishment, this would be the direct collision of authority spoken of, and the act of the State would be void. But if, (as indeed is admitted in M’Cullough v. Maryland) the State should tax its property, in common with the other property of the citizens of the State, this would be but incidental. If such incidental collision should avoid the act of the State, then, as was truly said in argument, in times of public emergency, any taxation by a State might be held to cripple the resources of the federal government. A very large portion of the legislation of every State indirectly interferes with the power granted to the federal government to regulate commerce: such are all quarantine laws, inspection laws, pilotage regulations, roads, bridges, and ferries, mercantile contracts, insurance, statutes of limitation, and the very marshalling of assets, and course of descents. In this manner, any power, granted to the federal government, *674 may be extended to almost every exercise of State authority.There are some of these State laws, which seem to interfere very directly with commerce ; such as quarantine laws; the laws-of some States forbidding the importation of slaves; the law of our own State forbidding black seamen to come into our ports , regulations respecting the importation of gunpowder, and other combustibles; and many others. How is the constitutionality of these to be vindicated 1 In no other way, that I know of, than thisthat they were in good faith intended, not to regulate commerce, but for the internal security of the State, or other municipal purpose, and that their interference with commerce is only incidental.
It will be perceived, that in my opinion the question is, whether the imposition in question is, in good faith, a tax, or whether, under the guise of a tax, a penalty was intended to be inflicted, with a view to the suppression óf the bank. Such a distinction was made in the case of the State v. Allen, 2 M’C. 55, where a tax, as it was called, of $10,000, was imposed on the act of selling lottery tickets. And this Court held, that, although called a tax, it was in fact a penalty, having no reference to property; and that it violated the provision of our constitution, that “ no freeman of this Stale shall be taken,, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or-deprived of his life, liberty, or property, but' by the judgment of his peers, or the law of the land.”
I am aware, that it has been objected to this method of construction, that it is liable to too great uncertainty, and gives to Courts a dangerous latitude of construction, in determining on the intention of the legislature. When will you say that the law becomes unconstitutional ? When the tax is raised to five, or ten, or fifty per cent l By what rule shall government be conducted 1 Or when can the legislature be assured that its laws will have effect 1 In general, perhaps, it is desirable, that rules of law should be technical and artificial; being thus susceptible of greater precision : but this is not always practicable, and I fear that we may sometimes run into the most dangerous errors, in- searching after this precise, technical, artificial rule. In such a case as this, it is not possible to have one, unless, by adopting such artificial reasoning as I have referred to in the beginning, we pervert the constitution to purposes, for which it, most noto *675 riously, was never intended, and change the whole character of . ..... S our institutions.
The method of construction, for which I contend, is familar to our law; and the plain good sense of our ancestors found r ° no difficulty ib applying it in practice. In the Chamberlain of London’s case, 5 Rep. 63. the question was of an ordinance of the City of London, by which, -all -cloths brought to London for sale, were directed to be brought to Blackwell Hall, and to pay Id. hallage, with a penalty of 6s. 8d. in case of neglect. It was urged, that it was against law, and the liberty of the subject, to compel him to bring his cloths to any one particular place; that if they might impose Id. they might impose.'2d. and so on, in infinitum. But the Court said the ordinance, being made to prevent frauds, was good; and the assessing of the Id. for hallage was good, because it was pro botto publico, and reasonable, having regard to the benefit which the subject enjoyed by reason of said ordinances. “ But,” Lord Coke remarks, “it is like pontage, murage, toll, and the like, as appears in 13 H. 4, 14 b. in which cases the sum for the repation of bridges, walls &c, ought to be so reasonable, that the subject shall have more benefit thereby than charge. Also the penalty inflicted, it was said, was lawful, being reasonable, and proportionable to the offence.”
So in Clark’s case, 5 Rep. 64, where the town of St. Alban’s having been incorporated, with power to make ordinances, a sum had been assessed on .the inhabitants, with the penalty of imprisonment in case of refusal to pay it, the Court held, that the corporation might impose a reasonable penalty, but that the penalty of imprisonment was unreasonable.
In the City of London's case, 8 Rep. 241, the tests of the validity of a eity ordinance were held to be: 1. liemedium debet esse congruum, it ought to have fit proportion and congruity. 2. It ought to be bonce fidei consonans. 3. It ought to be rationi consonum. 4. Pro communi uiilitate civium et aliorumfidelium ad eandem civitatem conflueniium. 5. Quod sit utile regiet pópulo. An ancient ordinance of the city had imposed a fine of 40s. on any stranger, keeping a shop, or exercising a trade within the city; and the ordinance in question imposed a penalty of £5, on any stranger secretly keeping such shop, or exercising such trade. This was held to be “ congruum, that is apt and proportionable to the of- *676 fence,” inasmuch as the keeping of a secret shop was a much, greater otrenee, than keeping an open one.
®° a^so> *n Heddy v. Wheelhouse, Cro. Eliz. 558, it is said, with respect to tolls imposed by a corporation, that they must be reasonable, to be lawful, and the Court will judge of their reasonsonableness.
The reasonableness of customs is a familiar subject of inquiry, Take the whole body of construction that has been made on the statute of Magna Charla, and you will find it all in the same spirit of inartificial common sense. In administering, or coni struing laws, the question always i§ of the intention of the legislature. In general, the intention is to be carried into effect; but if it be clear, that the true intention is opposed to the intention of another law of higher authority, are we not bound to refuse it effect? A jury, in passing on a man’s acts, generally decide also on his intentions. Many of the cases tha^ will arise will be proper for the determination of a jury. To be sure, we cannot go into evidence to determine, by what motives members of the legislature were actuated in passing the law; we must determine the intention from the terms of the law itself; and not from any particular expression, or form of words, but from the whole substance and context of the law. With respect to the uncertainty which is apprehended, it is very true, that many laws may be passed, in which it will be impossible to detect the true intention. But this very circumstance serves to shew, that no dangerous discretion will be committed to Courts. If the unconstitutional intention cannot be detected, the law must have effect. We cannot declare a law void, on a doubtful question of constitutionality; and it is only where the intention is apparent, that this interference can take place. It is one additional guard for the constitution, however inadequate a one.
The argument' that this is a discriminating tax, as it is called, rests on grounds, not very different from those 1 have been considering. Our constitution declares that “ no freeman of this State shall be taken, or imprisoned, or deprived of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land.” These words’ are taken from Magna Charta, but they cannot have exactly *677 the same meaning here, which was given to them in that instrument. The words “ law of the land,” were probably intended to refer to the law of parliament, in contradistinction to the royal prerogative; but it is impossible they should have the same meaning here, where uo royal prerogative existed at the time tlie eonstitution was adopted. Yet there is a very obvious meaning which may be well attributed to them. Respecting the definition of law, Blackstone says, 1 Com. 44, “ And first it is a rule, not a transient, sudden order, from a superior, to, or concerning a particular person: but something permanent, uniform, and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law. But an act to declare that the crime, of which Titius is accused, shall be deemed high treason ; this has permanency, uniformity, and universality, and is properly therefore a rule. ” Christian in his note quotes the description of Demosthenes: “ The design and object of laws is, to ascertain what is just, honorable, and expedient ; and when that is discovered, it is proclaimed as a general ordinance, equal and impartial to all.” If such an act as that mentioned by Blackstone, to confiscate the goods of Titius, can be regarded as a law at all, certainly it can with no propriety be spoken of as “the law of the land;” the general and equal law, to which every individual placed in the same circumstances is equally liable. It is at most but law for an individual. So in the case of the State v. Allen, (supra) the imposition was regarded not as the “law of the land,” imposing taxes.
It is difficult to lay down any rule, before hand,for determining what shall constitute a legitimate tax, and it might be improper to attempt it’; and yet, probably, in any particular case, which may arise,trhe difficulty will not be found very formidable. A few things may be thrown out by way of illustration. A double tax is imposed on the lands of absentees from the State; and there is no question -about the constitutionality of this: and why so % Persons absent from the State are exempted from x’endering to it many services, which those residing within the State are called upon to render: it is therefore reasonable, that they should pay a higher-price for the protection of their property; a.nd there is *678 no room to doubt, but that the tax was imposed, bona fide, upon such considerations. Yet if a law of taxation should declare, .without any such reason existing, that certain obnoxious individuals, by name, or a class of individuals, should be doubled taxed;could there be any doubt, that this would be a penalty, and not a bona fide tax? Yet the legislature must have much latitude. It is not necessary that a law of taxation should extend to every individual in a State. The law defining any particular crime extends only to those who shall commit it. If there be a peculiar species of property, owned only by a few individuals in a State; there is no reason why the legislature should not tax that as well as property which is more common: and circumstances may justify the taxing it more highly. If there were but a single individual owning a particular sort of property, there would be no reason why he should be exempted from taxation in respect of it; or if there were several owning the same sort, and there were reasons to induce the legislature to exempt all but one from taxation, of what would he have to complain, provided 'the imposition were no more than a fair and bona fide tux ?
With respect to the case before us, the argument is, that the tax is imposed only upon “ dividends arising from stock, owned by any citizen of this State, in all banks not chartered by the Stateand as there is no other bank within the State, not chartered by the State, except the Bank of the United States, the provision is supposed to have been aimed particularly at the stock of this bank. But what then ? It is still a tax upon income, and a tax of one per cent. The same act imposes a tax on income from professions of sixty cents per hundred dollars; and considering the precarious nature of the income, this is the higher tax of the two. It might as well be objected, that every sort of income was not equally taxed with that derived from professions and employments." A tax of sixty cents per hundred dollars is imposed on the gross capital of stock in trade. This is, I believe, the very lowest tax which the act imposes. There are very obvious reasons why the bank should not tax the stock of the banks chartered by itself. These banks exist under a contract with the State, for which the stockholders had paid a consideration to the State; and iheré might seem a want of good faith in subjecting them to greater burdens.
The necessity of some such method of construction seems to be acknowledged in the opinion of the Chief Justice, in M’Cul *679 lough v. Maryland, when he says that the real property of the bank may be taxed, “in common with the other property of the same description.” By imposing a sufficiently high tax on any real property that might be' owned or occupied by the bank, its exclusion from the State might be effectually accomplished. The tax in the case of Maryland^. M’Cullough was a stamp duty on the notes of all banks established without the authority of the State. The duty was a high one; and I do not say, that there was not enough in the act to shew, that it was not, in good faith, intended as a tax, but as a penalty for the purpose of suppressing the bank. B,ut suppose the tax to have been common to all the negotiable paper circulated within the State; what then should forbid it to have effect X It is said to be a tax on a franchise created by the federal government,' over which the State governments have no authority. It is still, however, a tax on the profits of the stockholders, who-are protected by the State in the exercise of their franchise; and the government, considered merely as a stockholder, is intitled to no greater privileges. The government of the United States has imposed, without question,a similar duty on the notes of banks chartered by the States ; franchises over which it has as little authority.
• With respect to the case before us, I see not the slightest ground to suppose the tax in question, a violation of the constitution. ,
O’Neall, J.
The question to be decided will not necessarily require any opinion to be given as to the constitutionality of the act of congress chartering the United States* Bank: its constitutionality has been affirmed by the highest judicial tribunal known to the constitution an'd laws of the United States; and that decision ought to put the question judicially at rest.
With the policy of the act of the legislature, imposing a tax on the dividends arising from stock owned by citizens of this State in the United States’ Bank, we have nothing to do. That was a question for the law makers, and not its expositors. I ■ may be permitted here, however, to say, without any want of respect for the enlightened body, who passed the act, that my opinion of the impolicy of such a law has not changed by my removal from the legislative, to the .judicial department of the government.
*680 Various objections to the constitutionality of the law of thffl ®tate were state(l by the ingenious counsel in favor of the motion ; but it cannot be expected that they should be all met and answere(* ’n Oie opinion now to be delivered. Such, as appeared to me to have the most important bearing on the question under consideration, will be considered in the course of the expression of my views in favour of the constitutionality of the act.
The taxing power is one which necessarily belongs to every sovereign. In despotic governments, it is exercised at pleasure and without restraint. In representative governments of every kind, it is more or less exercised under some check. In our government it is exercised by congress, under the express grants of power for that purpose contained in the constitution of the United States; and by the State legislature, under the original sovereignty of the State, over all subjects, the taxation of which has not been granted to congress. But little difficulty, it would seem, under this plain and distinct arrangement of the taxing power, ought to exist in deciding, whether a State tax is, or is not, constitutional. The only inquiry necessary to be made would be ; has the power to tax the matter, or thing, on which the State tax is imposed, been granted by the constitution of the United States to congress 1 If it has, the State tax is unconstitutional ; if it has not, then it is constitutional. To read the constitution of the United States, and decide from its letter, would seem to be the only canon of decision necessary to a correct judgment. But in a government so complicated as ours, in its various relations to the citizens of the States, and the States themselves, it may well be, that there is more difficulty in keeping the taxing powers of the United States, and the State, within clear constitutional limits, than would at first appear.
I concede, that a tax, imposed by the legislature of a Statgs which would defeat an act of congress, passed in pursuance of the power conferred on that body by the constitution of the United' States, or which would embarrass or defeat the constitutional operations of the United States government, is unconstitutional, under a sound construction of the constitution of the United States. This is, however, as far as I am prepared to go, in limiting the taxing power of a State by implication, or construction. Under this concession, and the admission that the act of congress chartering the United States Bank is constitutional, and *681 that the bank is a necessary instrument of the government for the collection of revenue, it may be, that an act of the State legislature, imposing such a tax as would amount to a prohibition of its operations within the State, would be unconstitutional. An act for the legitimate purpose of taxation, revenue, and not for prohibition, might, I should think, be constitutional, even if it were imposed directly on the stock owned by the citizens of the State in the United States’ Bank. But the act under consideration does not go so far; it is not a tax on the stock, but on the dividends, which are paid over to the citizen, and which then become his private and separate property, and are not at all connected with the United States’ Bank, except that they are derived from it. As well might a citizen contend, that a slave, purchased by him in Virginia with the dividends on his stock, and brought into this State, was not liable to taxation: for the slave was not liable to the taxation of this State until brought within it; and being acquired with the dividends of stock in the United States’ Bank, if the exemption of the bank from taxation extends to the dividends, it follows, that the acquisition, With them, of property not originally liable to the taxation of this State, ought also to be exempted. But the absurdity of such a proposition is too obvious to require more than to be stated. To me it appears equally absurd to contend, that income, derived from an institution not taxable, after it has been separated from it, and is in the pocket of a citizen amenable to all the taxing power of a State, and having no other safeguard against its abuse than the discretion of his representative, is still not liable to taxation. It is no longer United States’ Bank stock ;' it is no longer necessary to the operations.of the bank; it is private property. It is true, that the tax on it is a diminution of the citizen’s income, derived from this source; but that is the effect of every tax levied by the State. The tax on land and slaves subtracts that much from the planter’s annual income: so too operates the tax oñ stock in trade; on faculties, and professions ; on houses and lots in cities, towns, and villages; and on every other subject of taxation. It may be, that the tax on the dividends may operate unequally, in that it is virtually a tax on money at interest, which is not generally subjected to taxation. This objection, however, is not addressed to the proper forum; it belongs to the legislature, not to the judiciary, to decide on its propriety and *682 force. The legislature may select any‘property they please, to be taxed. If the tax is to operate generally on every citizen, who may own the property declared liable to it, it would be constitutional. If an act purports to exempt one class of citizens, owning property upon which it imposes a tax in the hands of others, it might be a discriminating tax, and unconstitutional.
It was urged, with great plausibility, that the bonus paid by the bank to the government of the United States, for the charter, is in consideration of an exemption from taxation, during the time the charter is to continue; and that the State being a party to this contract is bound by it. I was at first much inclined to think, that this position was just; and that the bonus might protect even the dividends from State taxation : but on reflection, I am satisfied it cannot avail the relators.
It is true, that the bonus may be regarded as paid for two-purposes ; first, for the franchise, and second, for exemption from taxation: and to this contract, made by the United States, the State is a party. But the inquiry arises, from what taxation did congress, in enacting the charter, contract that the bank should' be exempted 1 Surely none, save such, as by the constitution of the United States, congress might impose.- They could not, if they would, have contracted to exempt the bank from the taxation of the States. For their right to bind the States must be according to the power, the constitution of the United States, under which they are constituted their representatives. Such powers of taxation, as it confers on them, they might constitutionally agree should not be exercised in taxing the United States’ Bank; and so far the States would be bound by it. The bonus paid would not, of itself, exempt even the bank from State taxation. But it must be kept in mind, throughout this discussion, that the tax imposed by the act of the legislature is not on the bank, or on the stock, but on a citizen’s ineome derived from it. This makes, in my judgment, a distinction, which steers clear of every difficulty. It is a tax which requires none of the safeguards of constitutional law to prevent its abuse ; the relation of representative and constituent, according to the theory of our government, is sufficient for this purpose.
The case of Plowden Weston and others v. the City Council of Charleston, 2 Peters, 449, is that upon which most reliance *683 has been placed for a decision of this question in favor of the relators. That case, however, is, I think, clearly distinguishable from this. In it the tax was levied on the United States stock eo nomine ; and in the opinion delivered by Chief Justice Marshall, it is said, “ The tax on government stock is thought by this Court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the constitution.” 2 Peters, 469. His opinion, evidently, proceeds upon the ground, that the tax was calculated to defeat, or' embarrass, the government of the United States, in the exercise of a constitutional power. It might increase the premium at which the United Stales could borrow money: it might, if pursued in a feeling of hostility, defeat it altogether. If, however, that tax had been, in words, on the income derived from the stock by its holders,- as it was beyond all doubt intended to be, I cannot think the decision would have been against the constitutionality of it. For how then, could it have been a tax on government stock, a tax on the power to borrow money? It is true, it would have been a tax on the profits of the stock; yet it is still a tax on the money of a citizen in his own possession. It could not have increased the premium at which the United States were to borrow: nor eouldit have prevented the government from borrowing; for the government had already obtained the loan, and was not in the slightest degree to be affected by the tax. The citizen alone was to bear the burden in the diminution of his income. A tax on government stock, eo nomine, may be unconstitutional; and yet the tax on the profits received by a citizen from it be constitutional. The tax on stock before it was taken might have the effect to compel the government to pay an exorbitant interest. The lender, to secure himself from loss, might refuse to take the stock, unless he could get it, at such a.rate as would secure to him the interest and tax. Indeed, a tax might be so enormous, as to prevent the citizens of a State from taking the stock ' at all. Such a tax would be,beyond all doubt, unconstitutional. 'It would be the exercise of the power of taxation to defeat a power clearly delegated to the United States’ government.
For the purposes of this case, the case of M’Cullough v. the State of Maryland is all the authority to w.hich a reference is necessary to be had. The relators must fail according to the *684 principles and reasons, advanced by the great jurist who deliver-! ed that opinion. In 4 Wheat. 428, he says, “ in imposing a tax, the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.” His argument on this part of the ease went to shew, that the bank had not this security, the relation of representative and constituent not subsisting between it and the legislature of Maryland. And so far the argument was conclusive. Does it apply to this case 1 It is clear that it does not. The act operates directly upon the constituents of the legislature, who passed it, and upon none other. In the same page he says, “ The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse.” If this be constitutional law, and to me it seems to be clearly so, can there be a doubt as to the constitutionality of the act under consideration 1 The act taxes citizens, and their property. It may be unwise, unjust, and oppressive, but it cannot be unconstitutional. At page 429, he says, “ all subjects over which the sovereign power of a State extends, are objects of taxation; but those, over which it does not extend, are, upon the soundest principles, exempt from taxation.” In this position I fully concur. Apply its test to the case.under consideration, and let it be asked, is the subject of taxation under the act, one over which the sovereign power of the State extends ? It must be conceded, that it is. It is a tax upon a citizen’s money in his own pocket; and it is, therefore, a tax upon a subject within the jurisdiction of the State, and over which her sovereign power extends.
To the rule established by the decision in M’Cullough v. Maryland, that the United States' Banle was not liable to be taxed by the States, the Chief Justice, has carved out the very exception, within which the act of South-Carolina was passed. He remarks, “this opinion does not deprive the States of any resources which they originally possessed. ' It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest, which the citizens of Maryland may hold in this institution, *685 in common with other property of the same description throughout the State.” 4 Wheat. 436. To me it appears, that the conelusion of this great judge and constitutional lawyer would warrant a tax on the stock held by citizens of this State in the J United States’ Bank. Let that, however, be as it may, I am satisfied, both on general principles, and the authority of the case of M’Cullough v. the State of Maryland, that the act of December, 1830, imposing a tax on dividends arising from stock owned by any citizen of this State, in all banks not chartered by the - State, is constitutional; and that the motion, to reverse the decision of the judge below, ought to be dismissed.
Johnson, J.
The enlarged view which my brethren have taken of this case, would seem to supersede the necessity of any addition from myself, as I concur in the result, at which they have arrived. But the question arising out of it is of importance, as involving one of the very many disputes about the powers of the State and federal governments; and I have thought it worth while concisely to express, in my own way, the views which have presented themselves to my mind.
The question is, whether the act of the legislature of December, 1830, which operates to impose a tax of one per cent op the dividends of the stock of the bank of the United States, is, or is not, a violation of the federal constitution.
The form in which the question is put, concedes that congress had authority to incorporate the bank, nor was that position controverted in the argument; and the few remarks that I propose to make will proceed on the assumption, that the bank charter is constitutional. I shall take it for granted also, that the State has authority to levy on its citizens contributions, in the form, of taxes, for the support of its government, to the extent of its wants.
To the power of taxation, there is no express limitation, either in the State or federal constitutions; and consequently the legislature have authority to select the objects of taxation, to prescribe the rule by which the amount is ascertained, and the manner of collection. In practice, an effort has always been made, so to apportion the taxes, as to render the operation, as nearly as possible, equal upon every class of the community, respect being had to their respective means. The government is designed for the common benefit, and all are bound to contribute to its support, according to their ability, the rich largely out of their abundance, the poor a pittance out of their little; and if there *686 be any limitation to the power of the legislature over this subject, it is found in that principle of equality, which is the basis of all our institutions; an equality of benefits and burthens.
It is not pretended, that any limitation of this power is expressed either in the State or federal constitutions, which would prohibit the State from imposing a tax on the dividends of the stock of the United States’ Bank. But it is assumed, that the exercise of this power is inconsistent with the authority of congress to • incorporate the bank ; and it is said, that if the power of taxation is conceded, there is no limitation as to the extent, but that it might be used by the State even to prohibit the sale of the stock. '
The authority mainly relied on in support of this argument, is the case of Weston et al. v. the City Council of Charleston, 2 Peters, 449, in which it was ruled by the Supreme Court of the United States, that an ordinance of the City Council imposing a tax on stock, issued for loans made to the United States, was unconstitutional and void. But the authority of the State to tax the stock of the bank, owned by its citizens, in common with other property of the same description, is distinctly recognized by C. J. Marshall, in M’Cullough v. Maryland, 4 Wheat. 436. And although that was not the question directly at issue, the care, that was obviously bestowed on that great cause, excludes the idea, that any thing was advanced,,or conceded, which was not fully and deliberately considered. The case of Weston v. the City Council proceeded upon a supposed distinction between the two cases, and re-alfirms the judgment in M’Cullough v. the State of Maryland, and as authority may be regarded as decisive of this case. For myself, however, I must say, that I have never been able to see the soundness of the distinction attempted to be drawn, nor to yield a cordial assent to the judgment in Weston v. the City Council; and the influence which it has obtained in my mind, is rather the result of the habitual respect, which I have always paid to the learning and abilities of the Chief Justice, than to the convictions of my judgment.
The position maintained in Weston v. the City Council, is, that congress, by the constitution, has power to borrow money on the credit of the United States. That the power of taxation, if it exist at all, is unlimited as to the amount; and that the State, by imposing a tax which the Stock would not bear, might impede and obstruct congress in the exercise of the money bor *687 rowing power. In M’Cullough v. the State of Maryland the .' ,,. , , , • , . , - . . power to establish a bank is claimed for congress, as an mstrument essentially necessary to the fiscal operations of the government of the United States ; and impediments and obstructions in the sale of this stock, seem to me to operate as injuriously to the bank m&king power, as impediments and obstructions to the sale of stock for loans would to the money borrowing power.
' The supremacy of the constitution and laws of the United States, which all acknowledge, when followed out in all its bearings, necessarily leads to the conclusion assumed in M’Cullough v. the State of Maryland: “ that the States have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner control, the operation of the constitutional laws, enacted by congress to carry into effect the powers vested in the general government.” 4 Wheat. 436. But it ought to be constantly kept in mind, that congress has no authority to pass a law, which directly deprives a State of the rights, of which the constitution has not, divested her; nor will any act of congress be permitted, indirectly, to have that operation. Now, 1 set out with the assumption, that the State has authority to levy taxes on its citizens, to defray the necessary expenses of the State government, to select the objects of taxation, and to prescribe a rule by which the amount shall be ascertained; and without this power, the State governments would be a mockery. The only limitation known to it is that of equality amongst the citizens, and if congress may directly exempt any of them, or if an exemption arises by implication, there is not only a destruction of that equálity, but of the power itself.
The exemption claimed for the relators is founded on the circumstance, that they are the owners of stock in the bank of the United States, a corporation deemed necessary to the fiscal operations of the government. In other words, by a bonus paid to the United States for the privilege of banking, and by aiding in the collection and disbursements of the revenue, they have purchased an exemption from State taxes. To what would this' lead?- Every mail carrier, and common soldier, and the wholé army of office holders, in some degree, render services to the government, and would doubtless purchase exemption from State taxation, by concessions in stipulating for their remuneration t and if it may be purchased for a consideration, why not at once permit the United States to drive, bargains with those who desire it?
*688 in M’Cullough v. the State of Maryland, the objects of taxation are said to- be confined exclusively to subjects over which the sovereign power of the States extends; and that these are things which exist by the authority of the State, or are introduced by its permission: and I am persuaded, that the difficulties about this question have originated in confounding the person of the citizen, with the property which he owns. It is the citizen, and not the property, which pays the tax. The property is referred to, only as furnishing a rule by which the amount which the citizen ought to pay is ascertained. His personal liability is measured by the number of slaves, aud the quantity of land he owns; by his receipts of interest on money loaned ; by the amount of his professional income, or stock in trade &c.: and where, may I ask, is there any National distinction, between a tax imposed in respect to these sources of wealth and income, and Wealth derived from bank and government stock %
I am no advocate for obstructing the federal government in the exercise of its legitimate powers-; on the contrary I am persuaded, that the harmony and success of our institutions depend on conceding to it the full and unobstructed exercisé of all the powers delegated to it by the federal constitution. On the other hand, it is equally necessary that the States should be unrestrained in the exercise of all the powers reserved, and not delegated to the federal government. There are, however, some eases in which the State and federal governments may rightfully exercise concurrent powers over the same subject, as in the instance of taxation yand the case under consideration, in my judgment, furnishes another instance. In these cases the maxim, that you should so exercise your own rights, as not to impair another’s, furnishes the rule. Congress have authority to incorporate a bank, aud the State has the right to tax the citizen, and to make the dividends which he may receive on the bank stock, owned by him, a rule by which to ascertain the amount; but this right ought to be so exercised, as not indirectly to deprive congress of the contemplated benefit of the bank. The tax imposed in this instance; does not exceed in amount the taxes imposed on other property of the same description, and is therefore within the rule.
Motion refused.