## UNITED STATES v. CARLSON.
### No. 6186.

Circuit Court of Appeals, Ninth Circuit.
Oct. 6, 1930.

Rehearing Denied Dec. 1, 1930.

6

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash. (William Wolff Smith, Gen. Counsel, and Bayless L. Guffy, Atty., U. S. Veterans' Bureau, both of Washington, D. C., and Lester E. Pope, Atty., U. S. Veterans' Bureau, of Seattle, Wash.), for the United States.

George E. Flood and George E. Mathieu, both of Seattle, Wash., for appellee.

Before DIETRICH and WILBUR, Circuit Judges, and WEBSTER, District Judge.

WEBSTER, District Judge.

The appellee, plaintiff below, brought action to recover so-called "automatic" insurance under the War Risk Insurance Act (40 Stat. 398). From a verdict and judgment in his favor the government has appealed. In his complaint the plaintiff alleges, in substance: That on or about June 24, 1916, he enlisted in the National Guard of the State of Washington, and remained continuously therein until that organization was called into the service of the federal government by the President; that on April 28, 1917, and while engaged in the active service of the United States, he was discharged from the army upon a surgeon's certificate of disability, and that during his period of service and in the line of duty he contracted diseases and maladies which rendered him totally and permanently disabled. It is further alleged that under the terms of the War Risk Insurance Act he is deemed to have applied for and to have been granted insurance in the amount of $25 per month for the duration of his life in consequence of his claimed total and permanent disability.

The assignments of error relied upon by appellant give rise to the following contentions urged in its behalf: (1) That the appellee was never in the active military service of the United States; (2) that the statutory presumptions of soundness at time of entering the service and of service origin in case of tuberculosis are not applicable to appellee's case, and that the court erred in instructing the jury thereon; and (3) that there was no substantial evidence at the trial tending to prove total and permanent disability as alleged.

From the record it appears that appellee enlisted as a private in the National Guard of Washington on June 24, 1916, and reported with his organization at the designated place of rendezvous, for service under a call issued by the President on March 25, 1917, a few days prior to the declaration of war. After so reporting, he drilled and performed guard duty under orders of his superiors. On April 28, 1917, he was discharged from the service on a surgeon's certificate of disability. In order to recover it was incumbent on the appellee to show that he was in the active military service of the United States on or after April 6, 1917, and that while in such service he became totally and permanently disabled.

Section 401 of the War Risk Insurance Act (40 Stat. 409), in part, provides:

"Any person in the active service on or after the sixth day of April, nineteen hundred and seventeen, who, while in such service * * * becomes or has become totally and permanently disabled * * * without having applied for insurance, shall be deemed to have applied for and to have been granted insurance, payable to such person during his life in monthly installments of $25 each."

The obvious purpose of this section was to award insurance retroactively and automatically to all persons totally and permanently disabled during the time specified while in the active service of the government during the World War, but prior to the enactment of the War Risk Insurance Act. If appellee was a member of that class of soldiers, he is entitled to the benefits conferred by the act, precisely as he would have been had he been a holder of a policy of war risk insurance subsequent to the passage of the War Risk Insurance Act. After the passage of that act the soldier was required to apply for insurance in order to entitle himself to its benefits, but by the terms of the section quoted, a soldier in the active service of the government on or after April 6, 1917, if totally and permanently disabled, is deemed to have been granted insurance; that is to say, is to be treated and dealt with precisely as though he in fact held a policy of war risk insurance made available by the act. With this single difference it would seem that both classes of soldiers stand on an equal footing in respect of insurance. But counsel for the government maintain that the appellee was discharged from the National Guard of Washington, rather than from the active service of the federal government, for the reason that he had been rejected on account of disability before being finally accepted into the Army of the United States. This contention rests upon the premise or assumption that acceptance and enrollment in the Army of the United States is essential to active service within the meaning of the War Risk Insurance Act, or at least that physical examination and acceptance are essential prerequisites to such service. The appellee was a member of the Second Regiment of the National Guard of Washington, which was called to the federal service by the President on March 25, 1917, and as a member of this unit reported therewith at the designated place in obedience to the draft.

Section 1 of the National Defense Act (39 Stat. 166) provides that:

"The Army of the United States shall consist of the Regular Army, the Volunteer Army, the Officers' Reserve Corps, the Enlisted Reserve Corps, the National Guard while in the service of the United States, and such other land forces as are now or may hereafter be authorized by law."

Section 111 of the same act (39 Stat. 211), after empowering the President in case of war or emergency to draft the National Guard into federal service, provides:

"All persons so drafted shall, from the date of their draft, stand discharged from the militia, and shall from said date be subject to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Volunteer Army."

Section 49 of the Amendatory National Defense Act, approved June 4, 1920 (41 Stat. 784 [32 USCA § 81]), dealing with the status of the National Guard when drafted into the federal service, provides:

"All persons so drafted shall, from the date of their draft, stand discharged from the militia, and shall be subject to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Army, whose permanent retention in the military service is not contemplated by law. * * * Officers and enlisted men while in the service of the United States under the terms of this section shall have the same pay and allowances as officers and enlisted men of the Regular Army of the same grades and the same prior service. On the termination of the emergency all persons so drafted shall be discharged from the Army [and], shall resume their membership in the militia."

The record discloses that during the period of appellee's service under the call he received his pay from the Quartermaster of the United States Army—not from the Adjutant General of the State of Washington.

Section 115 of the original National Defense Act (39 Stat. 212 [32 USCA § 83]) provides:

"Every officer and enlisted man of the National Guard who shall be called into the service of the United States as such shall be examined as to his physical fitness under such regulations as the President may prescribe without further commission or enlistment."

It will be noted that this examination is not made a prerequisite to active service. It is merely an incident of that service and arises out of it.

Appellee's discharge discloses that he received a $60 bonus under the act approved February 24, 1919 (40 Stat. 1151). Under section 1406 of this act its benefits are confined to "persons serving in the military or naval forces of the United States during the

present war who have, since April 6, 1917, resigned or been discharged under honorable conditions."

The call of the President, to which we have referred, in part states:

"Having in view the necessity of affording a more perfect protection against possible interference with postal, commercial and military channels and instrumentalities of the United States * * * and being unable with the regular troops available to insure the faithful execution of the laws of the Union in this respect, the President has thought proper to exercise the authority vested in him by the Constitution and laws and to call out the National Guard necessary for the purpose."

The Governor of Washington was advised of the call by a telegram from the Secretary of War, as shown by a telegram from the War Department dated March 25, 1917, which states:

"Telegrams have been sent to governors of states indicated below calling into federal service of the United States forthwith the following named units of the National Guard: 'Washington Second Regiment Infantry.'"

In the case of Houston v. Moore, 18 U. S. (5 Wheat.) 1, 17, 5 L. Ed. 19, the Supreme Court was called upon to determine at what time and in what circumstances under the then existing laws did a portion of the militia drafted or called forth by the President enter into the service of the United States and change its character from state to national militia. In the course of the opinion Mr. Justice Washington says:

"That Congress might by law have fixed the period, by confining it to the draft; the order given to the chief magistrate or other militia officer of the state; to the arrival of the men at the place of rendezvous; or to any other circumstance, I can entertain no doubt."

 We think that under this language it might very well be said that by section 111 of the National Defense Act, supra, and section 49 of the Amendatory Act, supra, that Congress has fixed the period and that the Washington State Guard entered into the active federal service from the date of the President's call, for by these statutes it is provided that upon the draft the members of the state guard cease to be members of the militia and automatically become subject to the laws of the United States with respect to its military establishments. But be that as it may, a careful perusal of the entire opinion leaves no room for doubt that at the latest the guard did enter into the service of the United States at the point of rendezvous, and that no additional formalities or ceremonies were necessary to work the change.

From a careful study of the pertinent and related legislation hereinbefore set out, it seems equally clear that acceptance and enrollment in the National Army is not a prerequisite to "active service" within the meaning of the War Risk Insurance Act, but that a member of the National Guard, serving pursuant to a call or draft by the President ordering such guard into the service of the United States, is for the purposes of that act in the active service of the government. The benefits of the act are to be enjoyed by those soldiers who engaged in the active service of the United States during the time specified regardless of the branch of such service in which they may have been enrolled. Acceptance and enrollment in the National Army was not made a condition precedent to the insurance benefits provided by the act. By section 1 of the National Defense Act, supra, the National Guard becomes automatically a part of the Army of the United States when it is called into the active service of the government. The appellee reported in obedience to the call at the designated place; he drilled and did guard duty; he received pay from the national government; he was awarded a bonus as for active service and received a discharge from the army of the United States. If a soldier under proper authorization reports for duty at a designated place pursuant to a call by the President and there actually performs active military service for the government as a matter of fact, it is difficult to comprehend how he could fail to be in the active service as a matter of law, in the absence of statute to the contrary.

We conclude, therefore, that at the latest when appellee reported for duty as a member of his military organization at the place of rendezvous and actually entered upon the performance of military duties, he thereupon entered into the active military service of the United States, and so far as this element of his case is concerned is entitled to the benefit of the provisions of the War Risk Insurance Act upon which he relies.

 We pass now to the contention that the statutory presumptions of soundness at the time of entering the service and of service origin in the case of certain specified diseases are not applicable to a case where the recovery of automatic insurance is sought. As we gather it, the position of the appellant in this

regard is that the War Risk Insurance Act was expressly repealed by sections 600 and 601 of the World War Veterans' Act of June 7, 1924 (43 Stat. 629), and that automatic insurance survives solely by reason of the saving clause in the repealing statute; that, therefore, the appellee's rights are limited to those conferred in the original War Risk Insurance Act, and that that act contained no provisions with respect to presumptions. While this argument is ingenious, it is thought that it does not bear close scrutiny. The saving clause in the act reads:

"The repeal of the several Acts as provided in sections 600 and 601 hereof shall not affect any act done or any right or liability accrued, or any suit commenced before the said repeal, but all such rights and liabilities under said Acts shall continue and may be enforced in the same manner as if said repeal had not been made." 43 Stat. p. 630, § 602.

Now what were appellee's rights under the repealed statute? The answer is not difficult. He is deemed to have applied for and to have been granted a contract or policy of insurance as provided in that statute. In other words, he is to be regarded and dealt with as though he were an actual policy holder under that act. It necessarily follows, therefore, that his rights are precisely the same as those possessed by a soldier who, after the enactment of the War Risk Insurance Act, applied for and received a policy of insurance. It is settled by repeated decisions that the insurance provided by the War Risk Insurance Act is subject to all subsequent amendments, and the Congress has since the enactment of that law passed a number of acts modifying, enlarging, and restricting the character of insurance benefits originally conferred. This amendatory legislation in legal effect constitutes new, different, and additional terms in the insurance policy, exactly as though they had been incorporated in it. It is also settled that these subsequent amendments relate back to the time of the passage of the original act and measure the rights arising out of the insurance relationship contemplated by it. White v. United States, 270 U. S. 175, 46 S. Ct. 274, 70 L. Ed. 530; United States v. Conklin (C. C. A.) 27 F. (2d) 45; Baker v. United States (C. C. A.) 24 F.(2d) 766; Helmholz v. Horst (C. C. A.) 294 F. 417; Schroeder v. United States (D. C.) 24 F.(2d) 420.

Appellee's rights, therefore, did not become fixed and static by the repealing act, and are not to be governed solely by the original act which conferred the insurance upon him. On the contrary, he is entitled to precisely the same rights and is subject to precisely the same obligations enjoyed by or imposed upon any other holder of war risk insurance. By the saving clause in the repealing act all rights which he possessed under the original act are expressly reserved to him in the fullness of their integrity, just as though there had been no repealer and, to quote the language of the saving clause, "may be enforced in the same manner as if said repeal had not been made." Not only were all existing rights expressly saved, but the insured was entitled to resort to the same manner of enforcing them as he would have enjoyed if no repealer had been enacted.

In Brandaw's Case, reported in 35 F.(2d) 181, this court held that the statutory presumptions in question were applicable to a case involving the recovery of war risk insurance by an actual policy holder, and that it was reversible error to refuse a proper request that the jury be instructed concerning them. If it had been the intention of the Congress that the rights of holders of so-called automatic insurance were to be determined by any different standard of measurement than that defined for soldiers who actually applied for and received insurance, it is reasonable to assume that so important a discrimination would not have been left to tenuous inference or subtle argumentation. Appellant's contention in this regard must be rejected.

■ We have considered and disposed of the foregoing questions because they are sure to arise upon a retrial of the case, which we feel constrained to grant because of the error that we shall now discuss. The statute creating a presumption of soundness at the time of entering the service reads:

"That for the purposes of this Act every * * * enlisted man, or other member employed in the active service under the War Department or Navy Department who was discharged * * * prior to July 2, 1921, * * * shall be conclusively held and taken to have been in sound condition when examined, accepted, and enrolled for service, except as to defects, disorders, or infirmities made of record in any manner by proper authorities of the United States at the time of, or prior to, inception of active service." 44 Stat. p. 793, § 200, amended (38 USCA § 471).

The underlying thought of this language is that where the government, through its own officers and authorities, examines an ap-

plicant for admission to military service and thereupon accepts and enrolls him in the military establishment, it cannot thereafter be heard to assert, that is, is estopped from asserting, that such applicant at that time was in an unsound condition in any respect, save those officially noted at the time of, or prior to, the inception of service. We have already held that appellee was in the active service at least from the time he reported for duty at the place of rendezvous pursuant to the call of the President. The examination which was made of him by government physicians did not occur until after that time and consequently, subsequent to his entry into the active service of the United States. At the time of this examination the examining physician recorded in his official report: "This man states he has dysentery chronic and passes blood and mucus. Recommend that he be transferred to a hospital for observation before final acceptance or rejection.". From the record it appears that this examination and report were made very shortly after appellee reported for duty under the call, probably about March 26, 1917. Pursuant to the recommendation contained in this report the appellee was hospitalized and placed under the observation of physicians. On or about April 27, 1917, an examining board, consisting of Doctors Burdick and Austin, examined the appellee and found that he was suffering from amoebic dysentery and chronic tuberculous enteritis—diseases relied on for recovery in this case—and recommended that appellee be discharged from the service on account of these disabilities. The certificate of disability upon which appellee was discharged recites that he was suffering from chronic diarrhea; that he became unfit for duty from that disease on August 11, 1916, at Calexico, Cal., while on duty in the federal service; that the disorder commenced with gastro-enteritis, which became chronic, and was then still persistent; that on account of this disorder the soldier was incapable of performing military duty and was 25 per cent. disqualified from earning a livelihood. On the following day appellee was discharged from the service. In the light of this situation, it would seem to require no great elaboration to demonstrate that the appellee had not been examined, enrolled, and accepted within the meaning of the statute creating the presumption of soundness at the inception of service; not because he was not in the active service of the United States, nor because he is seeking recovery of so-called automatic insurance, but solely because the facts giving rise to the statutory presumption of soundness, and which are essential prerequisites to its existence, in appellee's case did not exist. To apply the presumption to this peculiar situation would be to extend the statute to a case which it was never designed to cover. It involves not the slightest inconsistency on the part of the government now to assert that appellee was afflicted at the time he entered active service, because the first opportunity it had to examine the appellee it discovered and declared the existence of the very maladies on which he now relies for a recovery. Appellee was not examined and accepted into the service. On the precise contrary, he was already in the service when the examination was made, and in consequence of his then existing disabilities and infirmities he was discharged. As the result of the examination the government could not refuse to accept the appellee for the simple reason that he was already in the service. All that it could do in the circumstances was to discharge him from the service, and that is precisely what it did. Moreover, how can disabilities be noted at or prior to active service when an examination is not made or authorized to be made until after such service has commenced?

For the foregoing reasons we conclude that it was reversible error to give the instruction in regard to soundness at the inception of service, to which appellant took exception at the time.

Judgment reversed, and cause remanded for further proceeding not inconsistent with this opinion.

WILBUR, Circuit Judge, concurs.